UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

IBUKUN OGUNBEKUN, as Limited Conservator
for the Estate of OLUWATOSIN OGUNBEKUN,
an incapacitated person,

                           Plaintiff,          Index No. 15-CV-06332 (CJS-JWF)

-vs-


TOWN OF BRIGHTON, BRIGHTON POLICE
DEPARTMENT, JULIE KNUTOWICZ and
RENEE (STICKLES) FISCHER,

                           Defendants.
_____

## DEFENDANTS' RULE 56 STATEMENT OF UNDISPUTED FACTS

### I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 56, and Western District of New York Local Rule of Civil Procedure 56(1), Defendants submit this Statement of Undisputed Facts in support of their Motion for Summary Judgement dismissing Plaintiff's Second Amended Complaint. As set forth in in the Memorandum of Law, as a matter of law, Plaintiff cannot meet her burden to establish liability on the part of any of the Defendants as the undisputed material facts demonstrate that the claimed constitutional violations did not occur pursuant to a Town policy or custom and there is no individual liability. *Monell,* 436 U.S. at 694. Consequently, there are no material facts in dispute, and the Defendants are entitled to judgment as a matter of law.

### II.    STATEMENT OF FACTS

1.    Plaintiff, Ibukun Ogunbekun (hereinafter "Ogunbekun") is the Limited Conservator for his daughter, Oluwatosin Ogunbekun (hereinafter "Tosin"), an "[i]ncapacitated

1

[p]erson." Second Amended Complaint, Introduction. (Docket #32-1).

2. At all times relevant hereto, Tosin was twenty-five years old, five feet six inches tall, and weighed approximately two hundred pounds. *See* Monroe County Incident Report, attached as Exhibit A to the Declaration of Karen Sanders, Esq.; *see also* Deposition Transcript of Ibukun Ogunbekun ("Ogunbekun Depo. Trans."), Exhibit B, at p. 21, lines 17-19.

3. Tosin lived in a group home from 2009 to December 31, 2012. *See* Ex. B, Ogunbekun Depo. Trans. at pgs. 23 – 26.

4. Thereafter, she lived at 32 Wintergreen Way, Brighton, New York. *See* Ogunbekun Depo. Trans. at pg. 23, lines 18-23.

5. Tosin suffered from seizure disorder and refractory epilepsy, which was difficult to control. *See* Ex. B, Ogunbekun Depo. Trans. at pg. 12, lines 4-12.

6. Ogunbekun determined that Tosin "could no longer stay at home by herself. She was no longer competent to stay home by herself." *See* Ex. B, Ogunbekun Depo. Trans. at p. 23, lines 3-7.

7. From December 31, 2010 through March, 2012, Tosin would receive treatment at various times at Strong Memorial Hospital ("Strong") in Rochester, New York. *See* Ex. B, Ogunbekun Depo. Trans. at p. 13, lines 2 - 9.

8. Prior to the incident at issue in this lawsuit, on January 6, 2012, Tosin was taken to Strong after Ogunbekun called 9-1-1 because Tosin had not slept or eaten for thirty-six (36) hours and was not taking her medication. *See* Ex. B, Ogunbekun Depo. Trans. at pp. 68 - 69, lines 19 – 25 and Exhibit C attached to the Declaration of Karen Sanders, Monroe County Hygiene Form, dated January 6, 2012.

9. Tosin told the responding officers, one of whom was Officer Renee Stickles, she was having complications from a non-existent pregnancy, and that unidentified people "from

2

Lime Rock Lane [were] breaking into her house stealing her things and trying to get her." *See* Ex. B, Ogunbekun Depo. Trans. at pp. 68 - 69, lines 2 – 25.

10. Tosin was treated in the Comprehensive Psychiatric Evaluation Program unit. ("CPEP") at Strong. *See* Ex. B, Ogunbekun Depo. Trans. at p. 61, lines 3 – 4.

11. After Tosin was treated at Strong, Ogunbekun felt that "[s]he became more easily agitated by strangers – especially law enforcement", and her "mental status was severely compromised." *See* Ex. B, Ogunbekun Depo. Trans. at p. 14, lines 2 – 19.

12. Tosin "came out worse in terms of her ability to even figure out simple things." *Id.*

13. Tosin "was afraid of law enforcement. Afraid of cops." *See* Ex. B, Ogunbekun Depo. Trans. at p. 45, lines 13 – 15.

14. Subsequent to her hospitalization at Strong, Tosin was "terrified of doctors and hospitals and anything to do with medicine." *See* Ex. B, Ogunbekun Depo. Trans. at pg. 34, lines 4 – 10.

15. On April 12, 2015, Brighton Police reported to the home because Tosin had called 9-1-1 because she was upset that guest were coming in to town and her father told her they would be using her bedroom. *See* Ex. B, Ogunbekun Depo. Trans. at pp. 29-30 and April 5, 2012 Domestic Incident Report attached as Exhibit D to the Declaration of Karen Sanders.

16. On the morning of May 29, 2012, Ogunbekun told Tosin that she had an appointment with a neurologist. *See* Ex. B, Ogunbekun Depo. Trans. at pg. 34, line 12.

17. In response to Ogunbekun's statement that she had a neurologist appointment, Tosin "flipped and she said no, she wasn't going anywhere; we had no right to make such an appointment for her, and she went out of the house in the rain and took the basketball to blow off steam." *See* Ex. B, Ogunbekun Depo. Trans. at p. 34, lines 1 – 16.

18.  Tosin was "mumbling and talking" as she was walking up and down her street. *See* Ex. B, Ogunbekun Depo. Trans. at p. 34, lines 22 – 23.

19.  It was raining at the time. *See* Ex. B, Ogunbekun Depo. Trans. at p. 33, lines 8-9.

20.  While Ogunbekun said that he was watching Tosin from the house, he also admitted that he did not see everything that was happening. *See* Ex. B, Ogunbekun Depo. Trans. at p. 35, lines 1-2.

21.  Nate Lenz, an employee of American Climatech was installing HVAC equipment at 84 Wintergreen Lane. See Supporting Depositions of Nate C. Lenz, signed May 29, 2012, attached as Exhibit E to the Declaration of Karen Sanders, Esq., at p.1.

22.  Tosin approached Lenz as he was working and was "talking crazy stuff" and kept saying stuff like "I'm watchin' you, I see you". *Id.*

23.  Lenz also observed she was dancing in the rain in the street and talking to herself. *Id.*

24.  Lenz told his co-worker that they should go inside because of the way she was acting. *Id.*

25.  They went inside and spent time eating lunch to see if she would leave. *Id.*

26.  Meanwhile, the Brighton Police Department received a 9-1-1 call from a citizen to "check the welfare" of an individual on Wintergreen Way in Brighton. *See* Deposition Transcript of Officer Renee Elizabeth Fischer nee Stickles (hereinafter "Officer Stickles")[1], Exhibit F, at p. 30, lines 6 – 9, p. 32, lines 2 – 4.

27.  Ogunbekun said he was advised that somebody had called 9-1-1 to say there was a lady on the street in the rain talking to herself and she seemed mentally disturbed. *See* Ex. B,

---

[1] At the times relevant to this case, Officer Fischer was known as Officer Stickles. She subsequently married, and her surname changed to Fischer.

Ogunbekun Depo. Trans. at p. 28, lines 15-19.

28. Officer Stickles was dispatched and arrived at the scene shortly thereafter. *See* Ex. F, Officer Stickles Depo. Trans. at p. 37, lines 17 – 21.

29. Officer Stickles was one of the members of the Monroe County Emotionally Disturbed Persons Response Team pursuant to a forty (40) hour training course on interacting with individuals with mental health issues. *See* Ex. F, Officer Stickles Depo. Trans. at p. 48, lines 13 – 25, p. 49, lines 2 – 13.

30. The Town has written General Orders policies and procedures for dealing with people with mental health issues. *See* Ex. F, Officer Stickles Depo. Trans. at p. 49, lines 13 – 20.

31. Brighton Police Department General Order 330.III.F.1 states: "[m]embers of the Brighton Police Department when dealing with persons during contacts on the street as well as during interviews and interrogations will be understanding of and attentive to the problems of persons experiencing mental or emotional difficulties and who may require police assistance and community mental health resources." *See* Declaration of Karen Sanders, Exhibit G.

32. Brighton Police Department General Order 330.III.F.2 states: "[m]embers of the Brighton Police Department will use judgment based on training, experience and discretion when exercising their powers of arrest under the New York State Mental Hygiene Law (NYSMHL) without compromising member, patient and/or public safety." *Id.*

33. Brighton Police Department General Order 330.III.F.3 states: "[m]embers making arrests and/or transporting individuals to the hospital pursuant to NYSMHL will share information surrounding the individual's conduct and/or arrest with hospital personnel involved in the evaluation of the person." *Id.*

34. Brighton Police Department General Order 330.III.F.4 states: "[m]embers

5

exercising any use of force when taking a person into custody pursuant to the NYSMHL must keep in perspective the goal of obtaining care and treatment for the mentally ill person.

    a.    The use of physical force must be reasonable and consistent with Brighton Police Department General Order 334, Use of Physical Force.

    b.    The use of deadly physical force must be reasonable and consistent with Brighton Police Department General Order 336, Use of Deadly Physical Force."

*Id. See also* General Order Policy 300, Use of Force, see Declaration of Karen Sanders, Exhibit H.

35.    Brighton Police Department General Order 330.III.F.5 states: "[t]aking Custody of Mentally Disturbed Individuals: (a) NYSMHL 9.41-Emergency Powers of Police Officers; this section authorizes police officers to take into custody and transport any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. In this case, the officer bases his/her decision to arrest and transport to the hospital on the subject's admissions, the officer's observations, witnesses' accounts, etc. For admission to the hospital the officer must complete the Monroe County Mental Hygiene Form (Appendix D)." *See* Exhibit G.

36.    Upon arrival at Wintergreen Way, Officer Stickles observed a female standing in the middle of the road in the rain, with a basketball in her hands. *See* Ex. F, Officer Stickles Depo. Trans. at p. 38, lines 19 – 25.

37.    Officer Stickles recognized the individual as Tosin from a previous police call. *See* Ex. F, Officer Stickles Depo. Trans. at p. 40, lines 17 – 22. *See also*, Ex. B, Ogunbekun Depo. Trans. at p. 30, lines 3-8.

38.    On that earlier date, Tosin had called 9-1-1 because she was upset that guests were coming into town and her father told her they would be using her bedroom. *See* Ex. B, Ogunbekun Depo. Trans. at pp. 29-30.

39. On that earlier date, Officer Stickles spoke with Tosin and the issue was resolved. *See* Ex. B, Ogunbekun Depo. Trans. at p. 30, lines 5-12.

40. Similar to how she handled that prior situation, Officer Stickles approached Tosin and asked her what the issue was, and why she was standing in the middle of the street. *See* Ex. F, Officer Stickles Depo. Trans. at p. 37, lines 24 – 25.

41. Tosin was speaking to people who were not physically present and was not responding to Officer Stickles' questions. *See* Ex. F, Officer Stickles Depo. Trans. at p. 41, lines 3 – 18.

42. Officer Stickles ultimately convinced Tosin to return to her house, where her father was present. *See* Ogunbekun Depo. Trans. at pg. 35, lines 5 – 7, *See* Ex. F, Officer Stickles Depo. Trans. at p. 47, lines 13 – 17.

43. Ogunbekun was not present for this first encounter. *See* Ex. B, Ogunbekun Depo. Trans. at p. 33, lines 15-17.

44. Ogunbekun and Officer Stickles suggested to Tosin that she take her basketball and bounce it on the back deck, but she refused as there was no one else back there. See Ex. B, Ogunbekun Depo. Trans. at p. 36, lines 8 – 12.

45. Officer Stickles was speaking to Tosin in a normal tone and did not raise her voice. *See* Ex. B, *Ogunbekun* Depo. Trans. at p. 38, lines 3 – 8.

46. Tosin then "stormed out" of the house through the front door, and "seemed much more agitated." *See* Ex. F, Officer Stickles Depo. Trans. at p. 56, lines 2 – 5.

47. Ogunbekun stated that she walked leisurely out through the door back to the street. Ex. B, Ogunbekun Depo. Trans. at p. 39, lines 17 – 22.

48. Ogunbekun did nothing to stop Tosin from leaving the house. Ex. B, Ogunbekun Depo. Trans. at pp. 39-40.

49. Officer Stickles followed Tosin. *See* Ex. B, Ogunbekun Depo. Trans. at pp. 39-40.

50. Ogunbekun stayed in the house as Tosin was mad at him. *Id.*

51. Officer Stickles followed Tosin down Wintergreen Way and asked her to stop to talk several times, but Tosin refused. *See* Ex. F, Officer Stickles Depo. Trans. at pg. 57, lines 5 – 13.

52. Tosin stated to Officer Stickles that she "want[ed] to kill [her] dad." *Id.*

53. Tosin went onto the porch of a house at 84 Wintergreen Way. Ex. F, Officer Stickles Depo. Trans. at p. 63, lines 2 – 4.

54. The porch was made of concrete. *See* Ex. B, Ogunbekun Depo. Trans. at pp. 50, lines 1-2.

55. Lenz and his co-worker were going to exit the house out the front door and were told to not to come out the front by Officer Stickles. Exhibit E, p. 1.

56. Lenz and his co-workers left out the back of the house and walked to the front of the house. *Id.*

57. Lenz saw two female officers speaking with Tosin, trying to calm her down. Exhibit E, pp. 1-2.

58. Tosin was "screaming, yelling and going nuts. It was getting worse." *Id.*

59. "The officers then tried to grab [Tosin's] arms but she flailed her arms and resisted." *Id.*

60. "[Tosin] screamed 'Jesus Christ' numerous times then the fight went to the ground." *Id.*

61. Michael C. Rozzi, also an American Climatech employee, observed the two female officers struggling with Tosin who "was screaming 'Your [sic] not going to put cuffs on me.' Supporting Deposition of Michael C. Rozzi, attached as Exhibit I to the Declaration of Karen

8

Sanders, p. 1.

62. Tosin was pulling Officer Stickles' long blonde hair violently, twisting and pulling it. *Id.*

63. Stickles yelled for Tosin to let go of her hair and stop resisting ten or more times. Supporting Deposition of Nicholas J. Viglino, attached as Exhibit J to the Declaration of Karen Sanders.

64. Stickles punched at Tosin to get Tosin to release her hair. *Id.*

65. When Ogunbekun was asked if he saw this part of the incident, he could not say:

> Q. Did you see Tosin grab Stickle's blond hair ponytail?
> **A. I can't say. Honestly, I can't say.**
> Q. You know there's an allegation of that.
> **A. There's an allegation of that. It is possible. I don't know for sure.**

*See* Ex. B, Ogunbekun Depo. Trans. at p. 49, lines 7-12.

66. The struggle went to the ground. Rozzi depo, Ex. I, p. 1.

67. One of the paramedics had arrived at the scene sat on Tosin's legs to assist with the restraint but Tosin continued to fight. *Id.*

68. Tosin tried kicking the officers, the tools and the plants by the sidewalk. *Id.*

69. "More officers arrived and placed her on the gurney." *Id.*

70. After a few minutes, Ogunbekun drove his car down the street to the front of 84 Wintergreen Way, which is where Tosin and Officer Stickles were standing on the front porch next to the front door. *Id.* and Ex. B, Ogunbekun Depo. Trans. at p. 40, lines 11 – 19.

71. Ogunbekun stated he drove because if he walked up to them it would have "escalated the issues." *See* Ex. B, Ogunbekun Depo. Trans. at p. 41, lines 1 – 13.

72. Tosin was hallucinating when she was on the front porch of 84 Wintergreen Way,

9

because "her mental state was unstable", and "what she [was saying was] just not real." *See* Ex. B, Ogunbekun Depo. Trans. at pg. 47, lines 4 – 16.

73.     Tosin made statements about being a princess and supervillain; that her husband lived at 84 Wintergreen Way; and, that it was her wedding day. *See* Ex. F, Officer Stickles Depo. Trans. at pg. 63, lines 16 – 24 and MHA Addendum, attached as Exhibit K to the Declaration of Karen Sanders.

74.     Tosin told Officer Stickles "she wanted [Officer Stickles] to die." *See* Ex. F, Officer Stickles Depo. Trans. at pg. 64, lines 4 – 5.

75.     Tosin was trying to enter 84 Wintergreen Way, a private residence, through the front door. *See* Ex. B, Ogunbekun Depo. Trans. at pg. 48, lines 3 – 5, Ex. F, Officer Stickles Depo. Trans. at pg. 65, lines 9 – 12.

76.     The resident of 84 Wintergreen Way locked the front door. *See* Ex. F, Officer Stickles Depo. Trans. at p. 65, lines 16 – 21.

77.     Ogunbekun was not present for any of the statements by Tosin. See, Ex. B, Ogunbekun Depo. Trans. at p. 42 - 43.

78.     Officer Stickles then called for another officer because of Tosin's increased agitation and erratic behavior. *See* Ex. F, Officer Stickles Depo. Trans. at p. 61, lines 3 – 7.

79.     At around that time, Officer Julie Knutowicz (hereinafter "Officer Knutowicz") arrived to assist Officer Stickles. *See* Deposition Transcript of Julie Knutowicz, Exhibit L, at p. 12, lines 10 – 25.

80.     Officer Knutowicz' understanding of the circumstances justifying a mental hygiene arrest was "if the person was making threats that she was going to either harm or kill someone or [the person] was going to harm or kill [themselves]." *See* Ex. L, Officer Knutowicz Depo. Trans. at p. 14, lines 17 – 22.

81. Officer Knutowicz attempted to engage Tosin in conversation, but Tosin "was rambling", believed that she was a princess and supervillain, and threatened to kill both Officers Stickles and Knutowicz. *See* Ex. L, Deposition Transcript of Julie Knutowicz, at pg. 13, lines 10 – 25.

82. At that point, Officer Stickles went through the analysis pursuant to her training as to whether the situation had escalated from a wellness check to a mental hygiene arrest. *See* Ex. F, Officer Stickles Depo. Trans. at p. 58 – 60, 66, lines 13 - 21.

83. Officer Stickles concluded that, because of the threats and Tosin's agitated state, a mental hygiene arrest was the right decision to safeguard Tosin. *See* Ex. F, Officer Stickles Depo. Trans. at p. 68, lines 9 – 23, Ex. L, Officer Knutowicz Depo. Trans. at p. 14, lines 4 – 10.

84. Kim DeCastro, the resident of 84 Wintergreen Way, looked out onto her front porch and felt that the two female officers needed help and called 9-1-1 to report that the officers needed help. Supporting deposition of Kim DeCastro, dated May 29, 2012, attached as Ex. M to the Declaration of Karen Sanders.

85. 9-1-1 documented the report of an officer in trouble. See 9-1-1 contemporaneous entries attached as Exhibit N to the Declaration of Karen Sanders.

86. Officers Flora and Swancott were dispatched to assist. *Id.*

87. DeCastro reported to 9-1-1 that officers were having problems handling the female and she thought that the female was overpowering the officers. *Id.*

88. DeCastro reported that the officers were calling for more help on the radio. *Id.*

89. DeCastro reported that an EMT was holding the female's legs down. *Id.*

90. Officer Stickles and Officer Knutowicz asked Tosin to voluntarily walk to an ambulance which had arrived at the scene, but Tosin refused. *See* Ex. L, Officer Knutowicz Depo. Trans. at p. 16, lines 5 – 9.

91. Officer Stickles put her hand on Tosin's arm to escort her to the ambulance. *See* Ex. L, Officer Knutowicz Depo. Trans. at pp. 16 – 17, Ex. F, Officer Stickles Depo. Trans. at p. 74 lines 2 – 9.

92. Tosin immediately grabbed Officer Stickles' ponytail and tried kicking and punching both Officers. *See* Ex. F, Officer Stickles Depo. Trans. at p. 77, lines 14 – 25, pp. 78 – 79, lines 2 – 20, Ex. L, Officer Knutowicz Depo. Trans. at p. 17, lines 8 – 13, and the Subject Resistance Report, attached as Exhibit O to the Declaration of Karen Sanders.

93. Officer Stickles, Officer Knutowicz, and Tosin then went to the ground. *See* Ex. F, Officer Stickles Depo. Trans. at p. 77, lines 24 – 25, Ex. L, Officer Knutowicz Depo. Trans. at pp. 17 – 18, and Rozzi depo, Ex. I.

94. Tosin continued to try and punch and kick the Officers. *See* Ex. F, Officer Stickles Depo. Trans. at p. 78, lines 2 – 7, p. 83, lines 6-12.

95. After a five (5) minute struggle, Officer Knutowicz was able to handcuff Tosin. *See* Ex. L, Officer Knutowicz Depo. Trans. at pp. 18 – 19.

96. Officer Knutowicz understood that, according to the Town Police Department's policies and procedures, the only time handcuffs would be used in a mental hygiene arrest was if the subject was resisting. Ex. L, Officer Knutowicz Depo. Trans. at p. 25, lines 4 – 14.

97. After Tosin was handcuffed, she was still highly agitated, and continued to actively resist. *See* Ex. F, Officer Stickles Depo. Trans. at pp. 101 - 102, Ex. L, Officer Knutowicz Depo. Trans. at p. 20, lines 7 – 10.

98. Tosin continued to fight back and resist even after she was handcuffed. Viglino depo, Ex. J.

99. Two male officers, Officer Flora and Officer Tomielo, arrived at the scene to escort Tosin to a waiting gurney for transport to the hospital. *See* Ex. F, Officer Stickles Depo.

12

Trans. at p. 104, lines 4 – 10, Ex. L, Officer Knutowicz Depo. Trans. at p. 20, lines 16 – 25.

100. The officers had to pick Tosin up from the ground as she would not stand up. *See* Ex. F, Officer Stickles Depo. Trans. at p. 104, lines 18 – 25, Ex. L, Officer Knutowicz Depo. Trans. at p. 21, lines 7 – 11.

101. Tosin continued to resist, flailing, fighting, kicking and twisting her body in an attempt to prevent herself from being placed on the gurney. *See* Ex. F, Officer Stickles Depo. Trans. at p. 105, lines 11 – 16.

102. As she was resisting, Tosin struck her head on the gurney railing, and began bleeding from her forehead. *See* Ex. F, Officer Stickles Depo. Trans. at pg. 106, lines 2 – 19.

103. Neither Officer Stickles nor Officer Knutowicz observed Tosin after she was placed in the ambulance. *See* Ex. F, Officer Stickles Depo. Trans. at p. 107, lines 20 - 24, Ex. L, Officer Knutowicz Depo. Trans. at p. 23, lines 8 – 13.

104. Officer Stickles injured her face, arm and leg during the struggle with Tosin and was medically assessed in an ambulance before returning to work. *See* Ex. F, Officer Stickles Depo. Trans. pp. 106-107 and Exhibit P attached to the Declaration of Karen Sanders, Technician Evidence.

105. After Tosin was placed in the ambulance, Ogunbekun went home, and then to Strong Memorial Hospital. *See* Ex. B, Officer Stickles Depo. Trans. at p. 107, lines 20 - 24Ogunbekun Depo. Trans. at p. 60, lines 4 – 19.

106. When Ogunbekun arrived at Strong Memorial Hospital, Tosin was seated on an examination couch and was calm. *See* Ex. B, Ogunbekun Depo. Trans. at p. 60, lines 2 – 3.

107. Tosin was transferred from the Emergency Room to the Comprehensive Psychiatric Evaluation Program (CPEP) unit. *See* Ex. B, Ogunbekun Depo. Trans. at p. 59, lines 11 – 17.

108. Tosin was observed for about four hours in the CPEP unit during which time she was calm: "Completely, totally calm. For four hours the same thing. It was the same thing in ER. I met her sitting on the exam table, calm." *See* Ex. B, Ogunbekun Depo. Trans. at p. 64, lines 17 – 19.

109. Tosin was not given any medication in the hospital, including no antipsychotics or antianxiety medications. *See* Ex. B, Ogunbekun Depo. Trans. at p. 64, lines 2 – 15.

110. Tosin received three (3) stitches for her head laceration, was kept for four hours for observation, and released the morning of the 28th [sic]. *See* Ogunbekun Depo. Trans. at pp. 63 – 65.

111. Upon her return to the Police Department Headquarters, Officer Stickles completed an Incident Report. *See* Ex. F, Officer Stickles Depo. Trans. at pp. 21 – 24 and Ex. A.

112. Upon her return to the Police Department Headquarters, Officer Knutowicz completed the Monroe County Mental Hygiene Addendum. *See* Ex. K.

113. The unverified Second Amended Complaint alleges "[t]he Brighton Police Department soon escalated and mismanaged the [mental hygiene arrest] situation", and an unidentified "most senior Brighton police officer on the spot" sent Ms. O to Strong Memorial Hospital based upon the "'proximity' rule, which had been abolished by the State several years prior." *See* Docket #32-1.

114. The Second Amended Complaint has two (2) counts. Count I alleges "[d]efendants violated Ms. O's right to freedom and protection against unreasonable seizures by making a false arrest using excessive force." Second Amended Complaint, ¶ 27 – 39, Docket #32-1.

115. Count II alleges that "Ms. O suffered an unconstitutional deprivation of her rights under the Fourth Amendment to the U.S. Constitution at Strong Memorial Hospital" because an unidentified "most senior Brighton police officer on the spot" sent Ms. O to Strong Memorial

Hospital based upon the "'proximity' rule, which had been abolished by the State several years prior." Second Amended Complaint, ¶ 40 – 49, Docket #32-1.

116. In response to the question what policies and practices of the Town proximately caused [Tosin's] constitutional injuries, Ogunbekun testified in his deposition: "[t]he way and manner in which the encounter was executed I believe was totally inappropriate." *See* Ex. B, Ogunbekun Depo. Trans. at p. 20, lines 15 – 23.

117. Ogunbekun went on to state: "[s]o I don't know what level of training [the Officers] had, but it was obvious to me the way and manner that they handled that encounter was grossly deficient and resulted in unnecessary use of manpower, resources – police resources – wishful –wasteful, inefficient and injurious." *See* Ex. B, Ogunbekun Depo. Trans. at p. 21, lines 7 – 12.

118. Ogunbekun also testified: "I don't know if [the Brighton Police Department has] any written policies of how to interface with persons with intellectual disabilities or mental health problems." *See* Ex. B, Ogunbekun Depo. Trans. at p. 43, lines 18 – 20.

119. At no time during his deposition did Ogunbekun identify a Town policy which was the driving force behind the alleged constitutional violations. *See generally* Ogunbekun Depo. Trans. attached as Exhibit B.

120. At no time during his deposition did Ogunbekun identify an unofficial custom or practice of the Town, or a pattern of constitutional violations, which preceded the constitutional violations alleged in the Second Amended Complaint. *See generally* Ogunbekun Depo. Trans., Ex. B

121. Tosin was charged with violations of Penal Law 205.20, Resisting Arrest, and Penal Law 240.26, Harassment in the Second Degree. See Informations by Officer Stickles, attached as Exhibit P to the Declaration of Karen Sanders, Esq. and the Certificate of Disposition,

15

attached as Exhibit Q to the Declaration of Karen Sanders, Esq.

122. Tosin opted to take an Adjournment in Contemplation of Dismissal as to each of the charges. *See* Ex. Q.

**Allegations in the Second Amended Complaint That Are Demonstrably False**

123. In addition to these material facts not in dispute, there are numerous factual paragraphs that are demonstrably false. For example:

> "11. In Ms. O's hand was a basketball which she bounced on the sidewalk as she strode up and down the short distance between home and the end of the cul-de-sac (approximately .1 mile long)."
> Ogunbekun was not present during this time. See ¶20, above. Ex. B, Ogunbekun Depo. Trans. at p. 35, lines 1-2. Multiple witnesses stated that Ms. O was in the middle of the street, not on the sidewalk as is claimed. See Exhibit E.

> "12. The Police did not just happen there by chance. Someone in the community (identity withheld by the Police) had called 9-1-1 because s/he perceived that Ms. O was mentally disturbed – she appeared to be rambling on about something and conversing with self."
> The report expressed concern because Ms. O was in the middle of the street and blocking traffic. See ¶¶27, 36, Ex. B, Ogunbekun Depo. Trans. at p. 28, lines 15-19; Ex. F, Officer Stickles Depo. Trans. at p. 38, lines 19 – 25.

> "13. Ms. O was upset because her parents had scheduled a Neurology appointment for that morning, one that she felt that she did not need. In the 45 minutes or so that she had been out letting-off steam, Ms. O did not threaten anybody. She even walked back to her home with R/O who later allowed her to go back on the street – the rain had stopped by this time."
> Again, Ogunbekun has no personal knowledge as he had stayed in his home during these incidents. See ¶20, above. Ms. O's conduct had, in fact, been threatening to people. Nate Lenz swore in his supporting deposition that Ms. O approached him and his co-worker while they were working on personal property and she was "talking crazy stuff" and kept saying stuff like "I'm watchin' you, I see you" to the point where he and the co-worker had to stop working and retreated into the customer's home. See Ex. E.

> "14. R/O thereafter tried to persuade Ms. O. to return home the second time but was not making progress. She decided to place Ms. O. on Mental Hygiene Arrest (MHA) apparently for non-compliance. Her father was later informed (by Emergency Room physician) that the Police claimed Ms. O threatened to kill her father. This claim is not substantiated by anyone except R/O."
> Ogunbekun has no personal knowledge as to the reason for the mental hygiene arrest as he was not present when the altercation began. See ¶48, 50, above. Officer Stickles stated that she concluded that, because of the threats and Tosin's agitated state, a mental hygiene arrest was the right decision to safeguard Tosin. *See* Officer Stickles Depo. Trans. at p.

68, lines 9 – 23, Officer Knutowicz Depo. Trans. at p. 14, lines 4 – 10.

"16. A neighbor who felt the officers were not doing the job quickly enough, called 9-1-1 for reinforcement. In their attempt to handcuff Ms. O, the Officers banged her head on concrete at the entrance of 84 Wintergreen Way where she was cornered, causing bruising, laceration and bleeding."

The contemporaneous records reflect that the resident of 84 Wintergreen Way called because when she looked out onto her porch, she felt that the officers were having problems handling the female and she thought that the female was overpowering the officers. See ¶84-89, above, Exhibits M and N. The claim that it was because the officers weren't being "quick enough" is pure speculation. Further, multiple witnesses stated that both Officers and Tosin fell onto the concrete porch because Tosin had taken hold of Officer Stickle's ponytail and was yanking on it with great force. Exhibits E, M and N.

"17. Ms. O. also suffered concussion from several blows to the head by Officer Knutowicz (eyewitness account corroborates this claim)."

Both the witnesses and Officers Stickles and Knutowicz establish that Officer Stickles used a forearm strike in an attempt to get Tosin to release her ponytail. Plaintiff did not produce any "eyewitness account" that Officer Knutowicz gave Tosin any blows to the head. See witness supporting depositions.

"22. Upon discharge from the hospital the Town of Brighton criminally charged Ms. O for assault and resisting arrest despite their having prior knowledge (dating back more than 5 years) that Ms. O was NOT mentally competent to fully comprehend her actions and consequences."

The documents establish that Tosin was charged with Harassment 2nd and Resisting Arrest. There was no charge for assault. Ogunbekun attempted to have the charges withdrawn due to Tosin's competency, but this did not occur, and she instead opted to take an ACD. Exhibit Q.

Dated: June 23, 2022
Rochester, New York

TULLY RINCKEY, PLLC

s/*Eugene Welch*
_____
Eugene Welch, Esq.
*Attorneys for Defendant Town of Brighton*
Office and Post Office Address
400 Linden Oaks, Suite 110
Rochester, New York 14625
Telephone: (585) 899-1458
ewelch@tullylegal.com

17