UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

IBUKUN OGUNBEKUN, as Limited Conservator
for the Estate of OLUWATOSIN OGUNBEKUN,
an incapacitated person,

                        Plaintiff,

       vs.

                                                    15-CV-06332 (CJS-JWF)

TOWN OF BRIGHTON, BRIGHTON POLICE
DEPARTMENT, JULIE KNUTOWICZ and
RENEE (STICKLES) FISCHER,

                        Defendants.

_____

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

Anna Marie Richmond
Attorney for Plaintiff
2500 Rand Building
14 Lafayette Square
Buffalo, NY  14203
716-854-1100
annamarierichmondesq@gmail.com

i

# Table of Contents

Table of Authorities ......................................................................................................................... iii

INTRODUCTION ............................................................................................................................ 1

FACTUAL ALLEGATIONS ........................................................................................................... 2

    A.   Background ............................................................................................................... 2

    B.   May 29, 2012 ........................................................................................................... 3

LEGAL ARGUMENT ...................................................................................................................... 9

    A.   Summary Judgment Standard ................................................................................... 9

    B.   Defendant Stickles Did Not Have Probable Cause to Initiate a Mental Hygiene Arrest ............... 11

    C.   Defendants Stickles' (Fischer's) and Knutowicz's Use of Force Violated the Fourth Amendment ...................................................................................................................... 15

    D.   Defendants are Not Entitled to Qualified Immunity ................................................ 18

    E.   *Monell* and Potential State Law Claims .................................................................. 19

CONCLUSION ............................................................................................................................... 19

## Table of Authorities

**Cases**

*Curry v. City of Syracuse*, 316 F. 3d 324, 333 (2d Cir. 2003) ...................................................... 10

*Frederick v. New York*, 449 F. Supp. 3d 115, 133 (WDNY 2020) ........................................ 14, 18

*Graham v. Connor,* 490 US 398 (1989) ................................................................................... 15, 19

*Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 240 (E.D.N.Y. 2015) ................................... 19

*Hicks v. City of N.Y.*, No. 12-CV-5081 (PKC) (SMG), 2015 U.S. Dist. LEXIS 136362, at *11 (E.D.N.Y. Sep. 30, 2015) ...................................................................................................................... 19

*Kerman v. City of N.Y.*, 261 F.3d 229, 237 (2d Cir. 2001) ........................................................ 11

*Myers v. Patterson*, 819 F.3d 625, 634 (2d Cir. 2016) .............................................................. 12

*Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991) ...................................................................... 10

*Rogoz v. City of Hartford*, 796 F.3d 236, 246-47 (2d Cir. 2015) ............................................... 15

*Tolan v. Cotton*, 572 U.S. 650, 651, (2014) .......................................................................... 10, 18

**Statutes**

Fed. R. Civ. P. 56(a) ...................................................................................................................... 9, 10

N.Y. Mental Hyg. Law § 9.41 ......................................................................................................... 11

## INTRODUCTION

Oluwatosin ("Tosin") Ogunbekun is a mentally retarded young woman who has suffered from a seizure disorder from the age of four months old.[1]  In May of 2012, at the age of 25[2], she was living in Brighton, NY, at the home of her parents, a medical doctor and a dentist,[3] having been recently released from a two-month in-patient psychiatric admission at Strong Memorial Hospital ("Strong").[4]  On the morning of May 29, 2012, Tosin's Dad informed her that she was scheduled for a neurologist's appointment later that day.[5]  Tosin, who was terrified of hospitals and doctors after her two-month stay at Strong, told her father she was not going anywhere, that he and her mother had no right to make such appointments for her, and went out of the house to let off steam.[6]

Unfortunately for Tosin, she is Black.[7]  At 1:21 p.m. a neighbor called in a report to the Brighton Police that a Black female who was possibly mentally challenged had been standing in the rain for approximately 45 minutes.[8]  The Brighton Police dispatched Defendant Renee Stickles (Fischer) to the scene.  *Id.*  Stickles Fischer arrived at 1:28 p.m.  By 2:09 p.m., Tosin was bleeding from a gash in her forehead, handcuffed behind her back,[9] and on her way to Strong Memorial Hospital in an ambulance, even though her father had repeatedly requested that she be taken to Rochester General due to Tosin's fear of Strong.[10]

Plaintiff has sued the Town of Brighton, the Brighton Police Department and arresting

---

[1].  Item 82-2, p.12, *lines 2-3*.
[2].  *Id.* p.21, *line* 17-19.
[3].  *Id.*, p. 11 *lines* 9-13.
[4].  *Id.,* pp. 68 *lines* 19-20, 69, *line* 11, 70, *lines* 9-11, 72, *lines* 13-15.
[5].  *Id.*, p. 34 *lines* 5-6.
[6].  *Id.*, *lines* 9, 12-15.
[7].  Item 89-14.
[8].  *Id.*
[9].  Item 82-2, p. 50, *lines* 13-25; p. 53, *line* 6.
[10].  *Id.*, p. 57, *line* 22 – p. 58, *line* 20.

officers Fischer (Stickles) and Knutowicz seeking damages and injunctive relief for alleged violations of her Fourth Amendment rights.[11]  Defendants have moved for summary judgment, dismissing the complaint in its entirety.[12]  For the reasons discussed *below*, Defendants' motion should be denied as to the Officers, and Plaintiff's claims should be presented to a jury.


## FACTUAL ALLEGATIONS

### A.  Background

Tosin moved with her family to Brighton in 2003.[13]  She was educated in Special Education classes,[14] and in 2006 when she was 19 years old, she was evaluated and determined to be reading at a second grade level, writing at a Kindergarten to first grade level, and having mathematical abilities at a Kindergarten to first grade level.[15]  The evaluation includes that she could be stubborn, and that she had chronic difficulty in appropriately communicating her feelings and understanding how her behavior and attitude affected those around her.[16]

Tosin lived in a group home from 2009 until December of 2011, when she suffered mental disorientation and hallucinations and was observed overnight at Strong.[17]  On January 6, 2012, she was admitted as an in-patient to Strong and treated for mental health issues for two months.[18]  Tosin was transported to Strong via a mental hygiene arrest in January 2012:  she had not eaten or slept for 36 hours, and her parents called 911, because they deemed the situation to

---

[11]. Item 32-1.
[12]. Item 82.
[13]. Ogunbekun Declaration ¶ 14.
[14]. *Id.* ¶ 13.
[15]. *Id.*, ¶¶ 15-16.
[16]. *Id.*, ¶¶ 17-18.
[17]. *Id.*, ¶¶ 19-20.
[18]. *Id.*, ¶¶ 23, 25.

be a medical emergency.[19]  The mental hygiene arrest itself was calm, and the transport to the hospital was without physical restraints.[20]

After Tosin's discharge from Strong, the police were again summoned to her home in response to a 911 call, on April 5, 2012, this time from Tosin herself, who called 911 because she objected to being asked to vacate her bedroom for an overnight guest.[21]  Officer Montes, who responded to the call spoke to Tosin, secured her agreement to comply with her father's requests, and left.[22]  Both the Plaintiff, Dr. Ibukun Ogunbekun ("Dr. Ogunbekun") and Defendant Sickles (Fischer) agree that Defendant Sickles (Fisher) was one of the officers who responded to the call on April 5.[23]

After Tosin was discharged from Strong in March 2012, her father observed that her mental acuity had diminished, her mental status was very severely compromised, and she became more easily agitated by strangers, especially law enforcement officers.[24]  Her parents determined that it was no longer safe for Tosin to stay at home unsupervised, as she was no longer mentally competent to distinguish risks to herself.[25]  Due to the nature of his work, Tosin's father, Dr. Ogunbekun, was the parent who was able to work from home and supervise Tosin.  He did so.[26]

**B.  May 29, 2012**

As has been discussed *above,* on the morning of May 29, 2012, Dr. Ogunbekun informed

---

[19] *Id.*, ¶ 23; Item 82-2, p. 59, *lines*, 19-20.
[20]. Ogunbekun Declaration, ¶ 25.
[21]. *Id.*, ¶ 35.
[22]. Item 82-2, p. 29, *line* 12 – p. 30, *line* 14; Item 82-4.
[23]. Item 82-2, p. 29, lines 12-19*;* Item 82-6, p. 40, *lines* 20-22; *see also* Defendants' Statement of Undisputed Facts, ¶¶ 37-39.
[24]. Ogunbekun Declaration ¶¶ 33; Item 82-2, p.14, *lines*, 2-19.
[25]. Ogunbekun Declaration, ¶ 34; Item 82-2, p. 23, *lines* 6-13.
[26]. Ogunbekun Declaration ¶ 35; Item 82-2, *Id.*

Tosin that she was scheduled for a neurologist's appointment later that day.[27]  Tosin, who was terrified of hospitals and doctors after her two-month stay at Strong, vehemently objected. She told her father she was not going anywhere, and that he and her mother had no right to make such appointments for her.  She then went out of the house to let off steam.[28]

The Ogunbekun family lived at 32 Wintergreen Way in Brighton, a dead-end residential street.  The street has a sidewalk on only one side – the odd-numbered side.  It was common for residents of the even-numbered houses to walk in the roadway when going from one even-numbered house to another or to the main road.[29]  After Tosin went outside, Dr. Ogunbekun monitored her from an upstairs window in the house.  He observed that it was drizzling, and that Tosin was walking back and forth on the sidewalk and appeared to be talking to herself.[30]  After a short while, Tosin came back into the house, picked up her brother's basketball, and went back out the front door.  Dr. Ogunbekun continued to monitor her from the upstairs window, and observed that she was carrying the ball and occasionally bouncing it, and that she appeared calm.[31]

Kim DeCastro, who lived at 84 Wintergreen Way, noticed Tosin when she left her house at about 1:15 p.m.[32]  At 1:22 p.m., in response to a call from the resident at 76 Wintergreen Way, Defendant Stickles (Fischer) was dispatched to Wintergreen Way to respond to a call of "B/F 13YO standing in the rain for 45 min poss mentally challenged playing w/ basketball."[33] Defendant Stickles (Fischer) testified that the call was to "check-the-welfare for a female standing – female, black, standing in the roadway for 45 minutes that appeared mentally

---

[27]. Item 82-2, p. 34 *lines* 5-6.
[28] *Id.*, *lines* 9, 12-15.
[29]. Ogunbekun Declaration, ¶¶ 27, 42-43.
[30]. *Id.*, ¶¶ 44-47.
[31]. *Id.*, ¶¶ 50-54.
[32]. Item 82-13
[33]. Item 82-14

challenged in the rain."[34]  The 9-1-1 caller did not report that the Black female in question was in the roadway, merely that she had been standing in the <u>rain.</u>

Defendant Stickles (Fischer) arrived on the scene at 1:28 p.m.[35]  Upon arrival, she recognized Tosin from prior police calls, thought that Tosin "seemed out of touch with reality," and "knew that [she] suffers from mental health problems."[36]

Between 1:28 p.m. and 1:44 p.m., Defendant Stickles (Fischer) engaged in conversation with Tosin, obtained Dr. Ogunbekun's telephone number from Tosin, had a short phone conversation with Dr. Ogunbekun, walked with Tosin to 32 Wintergreen Way, walked with Tosin and Dr. Ogunbekun through the house to the back door and patio gate to the lawn beyond the fence, had a discussion with Tosin about whether Tosin would be willing to play with the ball on the grassy common area behind the house, followed Tosin back through the house and out the front door, and followed Tosin "all over the neighborhood" while instructing Tosin to stop running away, and stopped at 84 Wintergreen Way.[37]  The parties dispute whether Tosin walked calmly out of the front door at 32 Wintergreen Way after she and Defendant Stickles (Fischer) spoke to Dr. Ogunbekun at the house; they do not dispute that Tosin and Stickles entered the house and then left.[38]

It is at this point that the parties' descriptions of the events diverge drastically.  Dr. Ogunbekun has attested that although Tosin was angry with him, "Everything was benign" when she left the house after 1:30 p.m., and she "walked leisurely out through the door."[39]  Dr. Ogunbekun did not follow Tosin and Defendants Stickles (Fischer) on foot, in order to not upset

---

[34]. Item 82-14; Exhibit10, Stickles (Fischer) Tr. P. 33, *line* 25 – p. 34, *line* 4.

[35]. Item 82-14, Item 82-6, p. 37, *line* 2; Item 82-1, p. 3/6.

[36].  Item 82-1, p. 3/6.

[37]. Item 82-1, pp 3-4/6.

[38]. *Compare* Item *82-6*, p. 56, *lines* 2 – 5 *with* Item 82-2, p. 39 *lines* 18-22.

[39]. Item 82-2, p. 39, *lines* 20-22; Ogunbekun Declaration, ¶¶ 68-69.

Tosin, and to allow Defendant Stickles (Fischer) to defuse the situation. Instead, he stayed behind a few minutes, then followed Tosin and Defendant Stickles (Fisher) to 84 Wintergreen Way in his car.[40]

According to the Police Radio Log, Tosin and Defendant Stickles (Fischer) arrived at 84 Wintergreen Way at 1:44 p.m.[41] According to Defendant Stickles' (Fischer's) Incident Report, by the time she and Tosin arrived at 84 Wintergreen Way, Defendant Stickles (Fischer) had already summoned another patrol unit to the scene, and had decided to execute a Mental Hygiene Arrest.[42]

When Dr. Ogunbekun arrived at 84 Wintergreen Way, Tosin and Defendant Stickles (Fischer) were on the porch of the home. Dr. Ogunbekun observed that Tosin was backed up against the door in a corner of the porch in a defensive posture, and appeared to Dr. Ogunbekun to be trying to escape from Defendant Sickles (Fischer).[43] Defendant Stickles (Fischer) told Dr. Ogunbekun that she was going to initiate a mental hygiene arrest. She did not tell him that Tosin had allegedly stated that she was 1) "going to kill her Dad" or 2) that she "wanted [Officer Stickles (Fischer)] to die."[44] Dr. Ogunbekun did not hear any such threats.[45] If she had told him of the alleged threats, Dr. Ogunbekun would have pointed out that children often express hyperbolic "threats" such as were attributed to Tosin that day, without truly intending to harm their parents.[46]

Dr. Ogunbekun told Defendant Stickles (Fischer) that he believed she was making the wrong call. As he testified:

---

[40]. Item 82-2, p. 42, *lines* 3-16; Ogunbekun Declaration, ¶¶ 72-74.
[41]. Items 82-14,
[42]. Item 82-1, pp. 4-5.
[43]. Item 82-2, pp. 42 *lines* 22-25; Ogunbekun Declaration, ¶¶ 79-80.
[44]. Ogunbekun Declaration, ¶¶ 82, 86-88; Item 82-2, p. 62, *lines* 16-23; *Compare* to Item 82-1, p. 5/6.
[45]. Ogunbekun Declaration ¶ 86.
[46]. Ogunbekun Declaration, ¶¶ 89.

Q.     What could have been done to get her off that porch and back home?

A.     Give her time.

Q.     Time?

A.     Keep her distance, give her time.  She will get tired with it.

Don't forget what I said earlier on.  I think it's very important.  You are dealing with somebody whose mental state is compromised.

I expected at least that this officer who was there in April and knew that – apart from the fact that they had records in the department – that this is a person with special needs.

She had mental health issues on top of intellectual disabilities.  You are going to have been patient when dealing with such people.

It's a benign situation.  It would tire itself out.

Don't forget that I also said she was afraid of law enforcement.  She was afraid of cops. So the more of them that came, the more it aggravated the situation.[47]

Defendant Knutowicz arrived at 84 Wintergreen Way at 1:50 p.m., after Dr. Ogunbekun got there,[48] and the situation was no longer "benign." Defendant Knutowicz joined Defendant Stickles (Fischer) on the porch.  Both defendants are significantly taller than Tosin:  Defendant Knutowicz is 5'6" tall and Defendant Stickles (Fischer) is 5'9";[49] Tosin is 5'3Tosin kept saying that she hadn't done anything wrong, and that she just wanted to play basketball with her friends.[50]

The Defendants grabbed Tosin's arms, and she began flailing and attempting to escape.

---

[47]. Ogunbekun Declaration, ¶¶ 91-93; Item 82-2, p. 44, *line* 18 – p. 45, *line* 15.
[48]. Item 82-14; Item 82-2, p.46, *lines*, 2-5.
[49]. Item 82-25, p. 2.
[50]. Ogunbekun Declaration, ¶¶ 95-96.

The Defendants were yelling, "Stop resisting!" Tosin was yelling, "Jesus Christ!"  According to the police reports and the reports of the civilian witnesses, Tosin grabbed Defendant Stickles' (Fischer's) long blond ponytail and twisted it.  Also, according to the civilian witnesses (including Dr Ogunbekun), Defendant Knutowicz punched Tosin several times on the head with a closed fist, and Defendant Stickles Fischer may have punched Tosin as well.

According to one of the civilian witnesses, Tosin yelled, "You're not going to put cuffs on me!" During the approximately five-minute-long struggle, Defendant Stickles (Fischer) documented that after Defendant Knutowicz "applied a knee strike" to Tosin, and the three women went to the ground. Tosin was under the two officers on the concrete porch.  Tosin was struggling and yelling, as were the officers.  An ambulance employee sat on Tosin's legs, as the officers applied "a forearm stun" and wrist locks, and cuffed Tosin's hands behind her back using two sets of handcuffs.[51]  Tosin was bleeding from a laceration in her forehead where it had struck the concrete floor of the porch.[52]

At least four more police cars arrived between 2 p.m. and 2:11 p.m., one of which contained two officers.  Additionally, at least two ambulances arrived on the scene.  Defendants Knutowicz and Stickles (Fischer) directed Tosin, who had suffered a concussion (closed head injury), was cuffed behind her back, and was bleeding from her forehead to stand.  Tosin could not stand, so several officers, including Defendant Stickles (Fischer) picked her up and carried her to a gurney.  Dr. Ogunbekun observed that the officers were unnecessarily rough; they slammed her onto the gurney, and the cut on her head began bleeding more.[53]

---

[51]. Item 82-1, p. 5; Item 82-15, p.2; Item 82-5; Item 82-9; Item 82-10, Item 82-11; Item 82-13; Item 82-15. Ogunbekun Declaration, ¶¶ 98-104, 111-117.
[52]. Item 82-2, p. 50, *lines* 13-14; Ogunbekun Declaration, ¶ 118.
[53].  Items 81-14, 82-2, pp. 50-55; Exhibit 13, Strong Memorial Hospital Discharge Summary; Exhibit 11 Brighton Volunteer Ambulance report;  Exhibit 5 Photos of Tosin in hospital.

8

Tosin was transported to Strong Memorial Hospital over Dr. Ogunbekun's objections.  He had requested that she be taken to Rochester General Hospital because of her recent traumatic experience at Strong.  Initially the ambulance crew and the two police officers (Stickles and Knutowicz) agreed that she should be taken to Rochester General, but they were overruled by a higher-ranking police officer who directed that Tosin be taken to Strong.[54]

The Emergency Room doctor at Strong informed Dr. Ogunbekun that the police had informed the Hospital that Tosin had been transported to the hospital because she had threatened to kill her father.[55]  Tosin was released from Strong the following morning, after being treated in the Emergency Room, and after observation in the mental health unit.  She required three stitches for the laceration in her forehead, and was diagnosed with Closed Head Injury and Laceration.  She was not administered any medications to address psychiatric issues by either the hospital or ambulance staffs.[56]

## LEGAL ARGUMENT

### A.  Summary Judgment Standard

Fed. R. Civ. P. 56(a) provides that, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  It is well-established that:

> The party seeking summary judgment bears the burden of
> establishing that no genuine issue of material fact exists and that he
> is entitled to judgment as a matter of law. The function of the

---

[54]. Item 82-2, p. 57 *line* 22 – p. 59, *line* 25; Ogunbekun Declaration, ¶¶ 125-127.
[55]. Ogunbekun Declaration, ¶¶ 135-136; Item 82-2, p. 62, *lines* 11-23.
[56]. Exhibit 13, Strong Memorial Hospital Discharge Summary; Exhibit 102 Brighton Volunteer Ambulance records; Item 82-2, p. 64, *line* 2 – 65, *line* 9; Ogunbekun Declaration, ¶¶ 137-141.

> district court in considering the motion for summary judgment is
> not to resolve disputed issues of fact but only to determine whether
> there is a genuine issue to be tried.  In assessing the record,
> including affidavits, exhibits, interrogatory answers, and
> depositions, to determine whether there is a genuine issue as to any
> material fact, the court is required to resolve all ambiguities and
> draw all factual inferences in favor of the party against whom
> summary judgment is sought  If, with respect to a material fact as
> to which the moving party contends there is no dispute, there is
> evidence in the record from which a reasonable inference could be
> drawn in favor of the nonmoving party, summary judgment is
> improper

*Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23, 91 (1986); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, (1970); *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); other citations omitted).

It is axiomatic that, "in ruling on a motion for summary judgment, "[t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v.*

*Cotton*, 572 U.S. 650, 651, (2014) (citing *Anderson v. Liberty Lobby, Inc.* 477 US 242, 255

(1986316 f 3d 324

Additionally,

> It is well established that "credibility assessments, choices
> between conflicting versions of the events, and the weighing of
> evidence are matters for the jury, not for the court on a motion for
> summary judgment. If, as to the issue on which summary judgment
> is sought, there is any evidence in the record from which a
> reasonable inference could be drawn in favor of the opposing
> party, summary judgment is improper.

*Curry v. City of Syracuse*, 316 F. 324, 333 (2d Cir. 2003) (citations omitted).

Here, there are genuine issues as to material fact that render a grant of summary judgment

to Defendants improper.  Broadly, the disputed issues of material fact are whether Defendant

Stickles (Fischer) had probable cause to initiate a Mental Hygiene arrest, and whether

Defendants Stickles (Fischer) and Knutowicz subjected Tosin to unconstitutionally excessive

force during the course of that arrest.  As is set forth in detail in Plaintiff's Response to Defendants' Rule 56 Statement, these broad disputes are manifested in a number of disputes as to the events that occurred on May 29, 2012.  The disputes between the parties must be resolved at trial.

### B.  Defendant Stickles Did Not Have Probable Cause to Initiate a Mental Hygiene Arrest

Defendants Stickles and Knutowicz assert that they effectuated a Mental Hygiene arrest of Tosin.[57]  Pursuant to N.Y. Mental Hygiene Law, a "police officer . . . may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others[] . . . and . . . may direct the removal of such person or remove him or her to any hospital" specified in the law.  N.Y. Mental Hyg. Law § 9.41.  In 2012, it was clearly established that in order to arrest a person pursuant to Mental Hygiene Law § 9.41, the officer must have had probable cause to believe that the person presented a risk of harm to herself or others.  *Kerman v. City of N.Y.*, 261 F.3d 229, 237 (2d Cir. 2001).

Here, the key question in dispute is whether at 1:44 p.m. on that afternoon of May 29, 2012, Tosin presented a risk of harm to herself or others.  Defendants Stickles (Fischer) and Knutowicz argue that she did.  However, an examination of the supporting arguments they propound for that proposition demonstrates that there is a genuine issue as to whether the Defendants had probable cause to arrest Tosin pursuant to Mental Hygiene Law § 9.41,

The conduct attributed to Tosin in the Defendant officers' reports and in the supporting depositions before Defendant Stickles' (Fischer's) decision to arrest her includes the following:

- Tosin was standing (or dancing) in the rain playing with a basketball in the road, talking

---

[57]. Item 82-21, ¶ 83, Item 82-11.

to herself.  (Items 82-10, 82-13, 82-14);

- Tosin repeatedly told HVAC Tech Viglino, "I see you."  (Item 82-10);

- After Tosin and Defendant Stickles (Fischer) left 32 Wintergreen Way, Tosin allegedly told Defendant Stickles (Fischer) that she (Tosin) was going to kill her Dad, and wanted Defendant Stickles (Fischer) to die. Items 82-1.  The only person who allegedly heard these statements was Defendant Stickles (Fischer).  Although Defendant Knutowicz repeats the claims in her Addendum, Item 82-11, she does not say she heard Tosin make the statements. Knutowicz arrived at 84 Wintergreen Way after Dr. Ogunbekun was there, and Dr. Ogunbekun did not hear the alleged statements. Ogunbekun Declaration ¶¶ 86, 92.

It is significant that Dr. Ogunbekun has attested that there was "minimal" traffic on Wintergreen Way on the date in question, and also that residents of the even-numbered homes typically walked in the roadway.  He has also attested that when he checked on Tosin from an upstairs window in his home, and when he drove to the end of Wintergreen Way, she was on the sidewalk.  *Id*. ¶¶ 42, 45, 46, 55.  Thus, although Tosin's conduct was odd enough to cause a resident to telephone 911 at approximately 1:20 p.m., (Item 82-14) and to warrant comment in the supporting depositions of Nicholas Viglino and Kim DeCastro, (Items 82-10 and 82-13), it does not rise to the level of placing Tosin or anyone else at risk of "serious harm."  As the Court of Appeals for the Second Circuit observed in denying qualified immunity to a police officer in another case involving a Mental Hygiene Law arrest:  "A person may be annoyed, uncooperative and irrational without presenting a danger to herself or of violence to others." *Myers v. Patterson*, 819 F.3d 625, 634 (2d Cir. 2016).

There is a genuine issue of material fact as to whether Tosin actually uttered the words attributed to her by the Defendant police officers. Dr. Ogunbekun did not hear those words, and

was not aware that Tosin had been accused of uttering them until informed by a doctor at the hospital.  Ibukun Declaration ¶¶ 135-136.  And even if Tosin did utter those words, the words in and of themselves cannot be said to have evinced a danger that Tosin was conducting herself in a manner likely to result in serious harm to herself or others.  Certainly, the officers did not discuss Tosin's alleged comments with Dr. Ogunbekun to ascertain if Tosin's alleged threat posed reasonable fear of serious physical harm to him.

It is important to note that the 911 entry at 1:21 p.m. begins "B/F 13YO standing in the rain . . ."  (Item 82-14)  Assuming that the abbreviation means "Black female 13-year-old" it suggests that the caller thought Tosin was a 13-year-old child."  Here we have a tiny woman, who looked far younger than her years[58] and who functioned at a primary school level of intellectual ability, carrying a basketball, and perhaps venting her resentment toward her father by exaggerated statements that cannot have been construed as genuine threats by any reasonable adult, much less by a police officer who had purportedly undergone 40 hours of training on interacting with individuals with mental health issues.  Item 82-21, ¶ 29.

An objective assessment of Tosin's physical stature belies the Defendants' descriptions of her as a 200-pound threat to their safety.  (Kim DeCastro described her as "not petite, but solid."  Item 82-13.)  However, it is significant that all of the people involved in the incident were white, with the exception of Tosin and Dr. Ogunbekun.  The white witnesses' implicit bias against Blacks is evident in their descriptions of Tosin, including, but not limited to, Defendant Stickles' (Fischer's) inflating Tosin's height by 3 inches, and her weight by 40 pounds or more in the resistance report Item 82-15 p. 1; Michael Rozzi opining that she was "high on some drug," Item 82-9, p. 3/3; and Kim DeCastro concluding that the police officers rather than Tosin

---

[58]. *See* Exhibit 6 for a contemporaneous image of Tosin.  Ogunbekun Declaration Regarding Exhibits ¶¶ 9-10.

"needed help." Item 82-13. (It is not clear for DeCastro's supporting deposition whether she

estimated Tosin's height at 5'0" or 5'10".)  Item 82-13.  Tosin suffered a laceration in her

forehead that required three stitches to close, and a concussion; in contrast, Defendant Stickles

(Fisher) sustained minor scrapes and scratches, Item 82-1. and Defendant Knutowicz was

unscathed.  *Compare* Exhibits 5 and 12.

There is a genuine issue of material fact as to whether Defendants had probable cause to

effectuate a mental hygiene arrest.  Assuming that they did not have probable cause, Plaintiff's

right to be free from unreasonable search and seizure was established as early as 2001.  As Chief

Judge Wolford has held:

> A § 1983 claim for false arrest, resting on the Fourth Amendment
> right of an individual to be free from unreasonable seizures,
> including arrest without probable cause, is substantially the same
> as a claim for false arrest under New York law. "This protection
> adheres whether the seizure is for purposes of law enforcement or
> due to an individual's mental illness. . . . To handcuff and detain,
> even briefly, a person for mental-health reasons, an officer must
> have 'probable cause to believe that the person presented a risk of
> harm to [them]self or others.'"  "Under New York law, an action
> for false arrest requires that the plaintiff show that '(1) the
> defendant intended to confine him, (2) the plaintiff was conscious
> of the confinement, (3) the plaintiff did not consent to the
> confinement and (4) the confinement was not otherwise
> privileged.'" New York law also provides that "the existence of
> probable cause is an absolute defense to a false arrest claim."

*Frederick v. New York*, 449 F. Supp. 3d 115, 133 (WDNY 2020) (quoting *Kerman, supra;* other

citations omitted.)  Here, it is undisputed that the Defendants intended to confine Tosin, that

Tosin was conscious of the confinement, and that Tosin did not consent to the confinement.  The

only issue to be decided is whether the confinement was otherwise privileged.  For the reasons

discussed *above*, Plaintiff contends there is a genuine issue to be tried on that question.  Plaintiff

must be allowed to proceed to trial.

14

### C. Defendants Stickles' (Fischer's') and Knutowicz's Use of Force Violated the Fourth Amendment

It is well-established that:  "'The "reasonableness" of' the amount of force used  . . . "must be judged from the perspective of a reasonable officer on the scene.... at the moment" the force is used. In sum, the "standard" to be applied in determining whether "the amount of force" used exceeded the amount that was "necessary" in the particular circumstances is "reasonableness at the moment."'"  *Rogoz v. City of Hartford*, 796 F. 3d 236, 246-47 (2d Cir. 2015) (citing *Graham v. Connor,* 490 US 398 (1989); other citations omitted).

The *Graham* plaintiff was tightly cuffed, slammed face-down into the hood of a police car and thrown into the back seat of a police car.  *Graham v. Connor*, 490 US 386, 389-90 (1989).  The Court held that "*all* claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard[.]"  *Id.,* at 395 (emphasis in original).  The Court articulated a balancing test of the individual's Fourth Amendment interests against the "countervailing governmental interests at stake," *Id.*, at 396, noted that the "reasonableness" of a particular use of force must be evaluated from the perspective of a "reasonable officer on the scene," *Id.*, and stressed that the "reasonableness inquiry is an excessive force case is an objective one.  *Id.*, at 397.

More recently, in a case involving a claim of excessive force brought by a pre-trial detainee, the Supreme Court held that such cases involve "two separate state-of-mind questions:" a question of the officer's "state of mind with respect to the bringing about of certain physical consequences in the world," and a question as to whether the officer considered the force applied to be "excessive."  *Kingsley v. Hendrickson*, 576 U.S. 389, 395, (2015).  With respect to the

latter question – whether the force used was "excessive", the Court held, "that the relevant standard is objective not subjective." *Id.* Determining that the use of force in the *Kingsley* case was deliberate, which it defined as "purposeful" or knowing," the Court held that the Plaintiff "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97.

Here, taking all facts of the excessive force claim in the light most favorable to Tosin, the evidence before the Court establishes that the force used against Tosin was objectively unreasonable. Defendants point to Tosin's "talking nonsensically, confronting workers on private property, her threats about her father, [her] trespassing on private property and attempting to enter the house such that the resident had to lock her door and she called 9-1-1, Tosin's yelling, Tosin's grabbing of Officer Stickles; pony tail and dragging both Officer Stickles and Knutowicz onto the concrete floor of the porch, her continue resistance even after being handcuffed, the need for an EMT to sit on her legs . . . and her flailing and fighting as additional officers placed her on the gurney so she could be loaded into the ambulance." Item 82-19, p. 10.

When each of these alleged actions are examined objectively, it becomes clear that some of the actions attributed to Tosin provide no basis whatsoever for a use of force (i.e., talking nonsensically, and telling the HVAC workers that she saw them and was watching them); that some of the descriptions of Tosin's actions have been misrepresented by Defendants (i.e. the alleged death threats, the purported trespass and attempted forced entry); and that <u>all</u> of Tosin's alleged physical actions were in response to Defendants' unjustified use of force against her.

"Talking nonsensically" is not a justification for a police use of force. The action Defendants characterize as "confronting workers on private property" consisted of Tosin saying, "I'm watchin' you. I see you" to Messrs. Lenz and Viglino – which is also no justification for a

16

police use of force.  As has been discussed in detail *above* Tosin's alleged "threat" against her father amounts to nothing more than childish expostulations that were not entitled to credence. None of these actions satisfied the standards for a mental hygiene arrest, nor did they justify <u>any</u> use of force.

Tosin did enter onto the porch of 84 Wintergreen Way.  Based upon Defendant Stickles' (Fischer's) own report, she did so believing her non-existent ex-husband lived there, and as she was becoming more and more agitated as a result of Defendant Stickles' (Fischer's) pursuit. Items 82-1, 82-13; Ogunbekun Declaration ¶¶ 79-81.  The witnesses agree that Tosin was not behaving rationally, however there is no indication in the records that she had engaged in any conduct that justified the use of force before ascending onto the porch at 84 Wintergreen Way.

Dr. Ogunbekun has attested that Tosin's efforts to enter 84 Wintergreen Way were efforts to escape the officers, Ogunbekun Declaration ¶ 80.  There is no evidence in the record to refute that observation.  Contrary to the characterization provided by Defendants, Ms. DeCastro locked her door after she called 9-1-1 because it was clear to her that the officers were not in control of the situation.  Item 82-13.

The witness depositions agree that Tosin did not begin yelling until after the officers grabbed her, and similarly that she did not grab Officer Stickles' (Fischer's) ponytail until after the officers grabbed her.   Items 82-1, 82-5, 82-9, 82-10, 82-11, 82-13, 82-15.  Bearing in mind that Tosin is a mentally disabled individual who functioned at a Kindergarten to second grade level and had chronic difficulty in appropriately communicating her feelings and understanding how her behavior and attitude affected those around her, Exhibit 4, her conduct can best be likened to that of a frightened and confused six- or seven-year old child.

Defendants' assertion that Tosin dragged them to the concrete floor of the porch does not

accurately reflect their own reports, which suggest, although do not make clear that the three women fell to the floor after Defendant Knutowicz applied a "knee strike," and knocked Tosin's feet out from under her. It seems likely that Tosin's hand was twisted in Defendant Stickles' ((Fischer's) hair at the time, which resulted in at least two of the women falling to the porch. A panicked child-like person, who was terrified and incapable of understanding why she was being attacked by police officers, found herself underneath two female officers with an EMT sitting on her legs. Is it any wonder that she struggled?

The evidence in the record establishes that there are genuine issues as to whether the force employed by Defendants Stickles (Fischer) and Knutowicz violate Tosin's Fourth Amendment rights. She must be permitted to proceed to trial on this issue.

### D. Defendants are Not Entitled to Qualified Immunity

The *Tolan* Court succinctly recapitulated the standard governing a defense of qualified immunity at the summary judgment stage in an excessive force case under the Fourth Amendment:

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury ... show the officer's conduct violated a [federal] right [.]"
>
> * * *
>
> The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation.

*Tolan, supra.* Here, as Chief Judge Wolford observed, the law governing mental hygiene law arrests was clearly established after the *Kerman* decision was rendered in 2001. *Frederick, supra*, at 133. Tosin's right to be free from excessive force during an arrest was established in

18

1989.  *Graham, supra.*

Where, as here, there are significant factual disputes about whether a plaintiff poses a threat to anyone, there is neither probable cause nor arguable probable cause for a mental hygiene arrest, and a finding of qualified immunity is not warranted.  *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 240 (EDNY 2015); *Hicks v. City of N.Y.*, No. 12-CV-5081 (PKC) (SMG), 2015 U.S. Dist. LEXIS 136362, at *11 (EDNY Sep. 30, 2015).

Assuming that a jury finds that Tosin's rights were violated, her right to be free from unreasonable seizure under the Fourth Amendment was clearly established at the time of her arrest in 2012. Thus, Defendants may not avail themselves of the protections of the qualified immunity doctrine.

### E.  *Monell* and Potential State Law Claims

Plaintiff withdraws the claims against the Town and the Brighton Police Department. Plaintiff has not raised a claim of malicious prosecution under state law.

### CONCLUSION

For the reasons discussed herein, Plaintiff respectfully urges this Court to deny the motions of summary judgment of Defendants Stickles (Fischer) and Knutowicz, and to schedule this matter for trial on the merits.

Respectfully submitted,

   /s/Anna Marie Richmond____
Anna Marie Richmond
Attorney for Plaintiff

19

2500 Rand Building
14 Lafayette Square
Buffalo, NY  14203
716-854-1100
annamarierichmondesq@gmail.com

Dated:  Buffalo, NY
        August 31, 2022