UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Ibukun Ogunbekun, *as limited conservator for the estate of Oluwatosin Ogunbekun*,

          Plaintiff,

    v.

Town of Brighton, Brighton Police Department, Julie Knutowicz and Renee (Stickles) Fisher,

          Defendants.

---

DECISION and ORDER

No. 15-CV-6332-CJS-MJP

APPEARANCES

For Plaintiff:                    Anna Marie Richmond, Esq.
                                         Buffalo, NY

For Defendants:            Eugene Welch
                                         Tully Rinckey, PLLC
                                         Rochester, NY

INTRODUCTION

**Siragusa, J.** Plaintiff Ibukun Ogunbekun ("Ogunbekun") commenced this action on behalf of his disabled adult daughter, Oluwatosin Ogunbekun ("Tosin"), alleging violations of her civil rights under 42 U.S.C. § 1983. The operative Second Amended Complaint ("SAC") (ECF No. 32-1) alleges that on May 29, 2012, the defendant police officers, Julie Knutowicz ("Knutowicz") and Renee Stickles Fischer ("Stickles"), falsely arrested Tosin, and subjected her to excessive force, in violation of her rights under the Fourth Amendment to the United States Constitution. SAC, ECF No. 32-1 at ¶ 3. Before the

1

Court is Defendants' motion for summary judgment as to all claims, ECF No. 82.  For the reasons that follow, Defendants' motion is granted.

## FACTUAL BACKGROUND

Unless otherwise noted, the following are the undisputed facts of the case, viewed in the light most favorable to Plaintiff.    Tosin is a "intellectually disabled adult female," SAC at ¶ 9, who suffers from seizure disorder, refractory epilepsy, and other mental disabilities. ECF No. 82-21 at ¶ 5; ECF No. 85-1 at ¶¶ 13, 16.  At all relevant times, Tosin was twenty-five (25) years of age, standing approximately five feet three inches tall, and weighing approximately one hundred sixty pounds.

Tosin had previously resided in a group home for disabled adults, but at all relevant times herein was residing at her parents' home, located at 32 Wintergreen Way, Brighton, New York. ECF No. 82-21 at ¶ 4; ECF No. 82-2 at 23:18–23.

As of May 2012, Tosin's mental health had been declining for several months, such that Ogunbekun, a medical doctor, had determined that she "could no longer stay at home by herself." *Id*. at ¶ 6 (quoting ECF No. 82-2 at 23:3–11).    On this point, Ogunbekun states:

> Tosin had on-going behavioral problems[.]  . . .  I observed that her mental acuity had diminished; her mental status was very severely compromised; she became more easily agitated by strangers, especially law enforcement. Tosin's mother and I determined that Tosin was not able to independently distinguish risks, and that she required constant supervision.

ECF No. 85-1 at ¶ ¶ 31-34.

On the day of the subject arrest, May 29, 2012, Tosin became "extremely upset" after Ogunbekun informed her that she had a neurology appointment that day, which she did not want to attend. ECF No. 85-1 at ¶ ¶ 39-40.    According to Ogunbekun, Tosin

"flipped and she said no, she wasn't going anywhere; we had no right to make such appointments for her, and she went out of the house and took [a] basketball to let off steam." ECF No. 82-21 at ¶ 17 (quoting ECF No. 82-2 at 34:13–16). After leaving the house, Tosin talked to herself while walking up and down Wintergreen Way in the rain, holding and bouncing the basketball. *Id*. at ¶¶ 18–19.  In this regard, Wintergreen Way was a street ending in a cul-de-sac, lined with Townhouse-style homes, with a sidewalk on just one side of the street.  Because of this design, Ogunbekun maintains, residents of Wintergreen Way frequently walked in the street.

While Tosin was "letting off steam" on Wintergreen Way, as Ogunbekun maintains, contractors were working outside a neighboring home at 84 Wintergreen Way. ECF No. 82-21 at ¶ 21. Tosin approached one of the workers, Nate Lenz ("Lenz"), who later recalled, in a sworn statement to police, that Tosing was "talking crazy stuff" and making remarks to him, such as, "I'm watchin' you, I see you."  ECF No. 82-5 at 1. Lenz further indicated that Tosin was dancing in the rain and talking to herself. *Id*.  Lenz's co-worker, Nicholas Viglino ("Viglino"), indicated in an affidavit that Tosin was "dancing in the middle of Wintergreen way" in the rain, and kicking a basketball in the street. ECF No. 82-10. According to Lenz, Tosin's behavior toward him and Viglino was alarming enough to convince them to move inside, to get away from her. ECF No. 82-5 at 1 ("I told my co-worker Nick [V]iglino, 'let's go inside' because I was afraid [that] she was going to go crazy on us.")).

By this same time, Tosin's behavior had prompted another neighbor to place a call to the 911 operator, in which she described Tosin as an apparently mentally-disturbed

woman who was standing in the rain talking to herself. ECF No. 82-21 at ¶¶ 26-27.[1]  In response to the neighbor's 911 call, Stickles, an officer with the Brighton Police Department, was dispatched to the scene. *Id*. at ¶ 28.  Stickles was a member of the Monroe County Emotionally Disturbed Persons Response Team, and, as such, had received training on how to interact with mentally-disturbed subjects. *Id*. at ¶ 29.

When Stickles arrived, she saw Tosin standing in the street, in the rain, with a basketball. *Id*. at ¶ ¶ 36-37.  Stickles recognized Tosin from a prior encounter, in April 2012, in which Stickles and another officer had been dispatched to the Ogenbekun residence, after Tosin had placed a 911 call to complain about what she perceived as mistreatment by parents, after they had asked her to vacate her bedroom to make room for a visiting houseguest.[2]

Stickles approached Tosin and asked why she was standing in the street. ECF No. 82-21 at ¶ 40. Tosin did not respond to Stickles' questions, and instead spoke, as if hallucinating, to people who were not there. *Id*. at ¶ 41.  In a subsequent police report, Stickles stated: "The female seemed out of touch with reality and was ranting, and talking to people who were not there." ECF No. 82-1 at p. 3.  Tosin refused Stickle's request to get

---

[1] *See also*, Plaintiff's Memo of Law, ECF No. 85-17 at p. 4 ("At 1:22 p.m., in response to a call from the resident at 76 Wintergreen Way, Defendant Stickles (Fischer) was dispatched to Wintergreen Way to respond to a call of "B/F 13YO standing in the rain for 45 min poss mentally challenged playing w/ basketball." Defendant Stickles (Fischer) testified that the call was to "check-the-welfare for a female standing – female, black, standing in the roadway for 45 minutes that appeared mentally challenged in the rain.") (footnotes omitted).

[2] This was not Tosin's only prior encounter with the police.  Previously, in January 2012, Ogunbekun had called 911 after Tosin had gone 36 hours without food, sleep or drink.  The responding police officers made a mental hygiene arrest and took Tosin to the hospital, where she subsequently received two months of inpatient treatment.  Ogunbekun maintains that following this encounter with police, Tosin's "mental status" became "severely compromised," and she was fearful of police officers. ECF No. 82-2 at 14:13–14. Ogunbekun admits, however, that as previously discussed, Tosin herself placed the 911 call in April to 2012 to complain about her parents.

out of the roadway, and stated that she was angry at her father. ECF No. 82-1 at p. 3. Nevertheless, Stickles was able to obtain Ogunbekun's phone number from Tosin, and telephoned Ogunbekun, who told her that Tosin's mental health had been deteriorating lately, and that she would not do anything he told her to do. ECF No. 82-1 at p. 4 ("Ibukun told [this Officer] that Tosin's mental health condition has been deteriorating lately, and she won't do anything she is told."). Stickles, though, successfully convinced Tosin to return home. ECF No. 82-21 at ¶ 42.

Ogunbekun did not witness of any of foregoing incidents outside 84 Wintergreen Way, since he had been at home. In that regard, Ogunbekun indicates that when Tosin left home that day, he "checked on" her "periodically," by looking out a window of his house. ECF No. 85-1 at ¶ 52. However, he admits that he did not see any of Tosin's interactions with Lenz, Viglino, or Stickles, prior to Stickles escorting Tosin home. ECF No. 82-2 at p 34.

Once back at the Ogunbekun residence, Stickles and Ogunbekun suggested that Tosin take her basketball into the back yard. ECF No. 82-21 at ¶ 44. However, Tosin refused and went back out to Wintergreen Way. *Id*. In particular, Ogunbekun indicates that Tosin walked out the door in a leisurely manner. ECF No. 82-6 at 56:2–5; ECF No. 82-2 at 39:17–22.

Stickles followed after Tosin, but Ogunbekun remained inside because, according to Ogunbekun, "Tosin was angry with me, so I did not follow them immediately. I remained inside the house for a few minutes to allow the Officer to handle the situation, and to defuse the tension between Tosin and myself." ECF No. 85-1 at ¶ ¶ 70-72.

Stickles, meanwhile, followed Tosin and asked her to stop, but Tosin refused and

ran away, stopping again at 84 Wintergreen Way, where she had earlier spoken to Lenz and Viglio.  Stickles followed Tosin and placed a radio call requesting that another patrol unit come to the scene. ECF No. 82-1 at p. 4.  Tosin, meanwhile, told Stickles that she wanted "to kill her Dad," and wanted Stickles "to die." ECF No. 82-1 at p. 4.

As Stickles and Tosin were standing outside 84 Wintergreen Way, Ogunbekun arrived, having driven there in his car. Okunbegun Dep., ECF No. 82-2 at p. 47; *see also*, ECF No. 85-1 at ¶ ¶ 73-75 ("About five minutes later, I got into my car and followed in the direction Tosin and Defendant Stickles (Fischer) had gone.  I found [them] outside of 84 Wintergreen Way.  [They] were on the concrete porch of 84 Wintergreen Way.").  Ogun-bekun admits that he did not witness anything that had transpired between Tosin and Stickles between the time they left the house and the time he arrived at 84 Wintergreen Way. ECF No. 82-2 at p. 43 ("I don't know, you know, what transpired between the time that Tosin left the home with the officer and the time that I got there.").

Defendant officer Knutowicz arrived shortly thereafter and joined Stickles in con-versing with Tosin.  According to Knutowicz, Tosin "was rambling, she was talking about different things[, such as] that she believed she was a princess and a super villain," and, more significantly, "that she wanted to kill" Stickles and Knutowicz. ECF No. 82-12 at p. 3; *see also*, Knutuwicz Dep., ECF No. 82-12 at p. 3 ("She did make a statement that she wanted to kill us.").

Ogunbekun acknowledges that Tosin, who was agitated to begin with, became increasingly agitated throughout the entire confrontation between the officers and Tosin at 84 Wintergreen Way, though he blames the officers for that. ECF No. 85-1 at ¶ ¶ 81 ("I could see that Tosin was becoming more and more agitated."); 98 ("Tosin appeared to

be becoming more agitated; the Defendants continued to escalate rather than defuse the situation, giving Tosin repeated orders in strong, loud voices.").   Ogunbekun further acknowledges that Tosin was "hallucinating" during the confrontation. ECF No. 82-2 at p. 48 ("By this time she had started hallucinating again, because, like I said, her mental state was unstable.").

Stickles then radioed for an ambulance, for a mental hygiene arrest. *Id*.   In that regard, Stickles indicated that she believed the criteria were met for a mental hygiene arrest, since Tosin was both exhibiting signs of mental illness and making threats of harm toward others:

> She was exhibiting signs of mental illness, in my estimation, and she is now making verbal threats.   Verbal threats of being either homicidal, suicidal, wanting to cause injury to somebody else, statements wanting to hurt me, statements about wanting to hurt her father.   That is now enough criteria [for a mental hygiene arrest].   The person doesn't have to be swinging a bat around for you – you know what I mean – to have that element of danger-ousness.   The element has been raised, so now I'm going to have an am-bulance come[.]

Stickles Dep., ECF No. 82-6 at p. 66.

As Stickles and Knutowicz stood with Tosin at 84 Wintergreen Way, awaiting the arrival of an ambulance, Tosin, who was never-married and childless, "was ranting and not making sense[,] stating that she is a princess, super-villain, and mother of three kids[, and that] she is getting married today and will be leaving for her honeymoon." ECF No. 82-1 at p. 4.   Tosin was also "wiggling the door handle trying to get into" the residence, where she claimed her ex-husband resided. ECF No. 82-6 at 63:18–20, 65:9–12.   Ogun-bekun admits that Tosin was trying to gain entry to the neighbor's home, but insists that she was only trying "to get away from the officers." ECF No. 82-2 at 48:6–7.

Once an ambulance arrived, Stickles and Knutowicz told Tosin that she was going to be taken to the hospital for a mental hygiene arrest, and asked her to walk to the ambulance, but Tosin refused. ECF No. 82-1 at p. 4. Stickles then grabbed Tosin's arm, but Tosin immediately began flailing her arms and attempting to strike the officers. *Id*. at 5. Tosin hit Stickles, and also grabbed Stickles' ponytail "and started to twist and pull it." *Id*. Stickles then "yelled[,] for Tosin to let go of her hair and stop resisting[,] ten or more times." ECF No. 85 at p. 17, ¶ 63.

Stickles, Tosin, and Knutowicz then fell together to the ground, with Tosin still gripping Stickle's hair, where Tosin attempted to hit and bite both officers. ECF No. 82-1 at p. 5; *see also*, Stickles Dep., ECF No. 82-6 at p. 21 ("So now I touch her to escort her on her elbow, and she hauls off and hits me. She did make contact with a punch. And then she grabbed my hair and we both went to the ground at this point.").

Stickles indicates that she used a "forearm stun" and "empty handed" punches to force Tosin to release her ponytail. ECF No. 82-15 at p. 2. However, Tosin continued attempting to bite, choke, and pull Stickles' hair, while refusing to be handcuffed. *Id*.[3] Stickles eventually "applied a wrist lock" to Tosin's right wrist, while an ambulance attendant sat on Tosin's legs, which enabled Knutowicz to apply handcuffs. ECF No. 82-1 at pp. 5-6. [4]

---

[3] In addition to having her hair pulled by Tosin, Stickles also suffered minor injuries to her face, arm, and leg during the altercation. ECF No. 82-21 at ¶ 104. Tosin was consequently charged with assault and resisting arrest, but those charges were eventually dismissed after Tosin was granted an adjournment in contemplation of dismissal.

[4] Officers later took the following sworn statement from Lenz: "On 5/29/12 at about 1:55 pm, I was at 84 Wintergreen Way installing HVAC equipment for my company, American Climatech. While outside servicing the air conditioner unit, a strange Black woman came up to me and was talking crazy stuff. She kept saying stuff like, "I'm watchin you, I see you." She was dancing in the rain in the street while talking to herself. I told my coworker Nick Biglino, "Let's go inside" because I was afraid she was going to go crazy

Ogunbekun offers no additional or contrary facts about the struggle leading up to the handcuffing, except to say: "All three women were yelling; there was a lot of commotion on the porch. I saw Defendant Knutowicz punch Tosin several times on the head with her fist." ECF No. 85-1 at ¶ ¶ 113-114. That is, Obunbekun maintains, contrary to what the officers and other witnesses have stated, that he saw Knutowicz, and not Stickles, punching Tosin.[5] At the same time, Ogunbekun, despite having stood only a few feet away from the scuffle, maintains that he could not see what Tosin was "doing with her hands" during the scuffle, ECF No. 85-1 at ¶ 103, and that he could not see whether Tosin had ahold of Stickles' ponytail. ECF No. 82-2 at p. 50 ("Honestly, I can't say. . . . There's an allegation of that. It is possible. I don't know for sure.").

In any event, by the time Stickles and Knutowicz had Tosin handcuffed, other officers had arrived at the scene, who, because Tosin was unable or unwilling to stand, assisted in lifting her onto an ambulance gurney, where she continued to flail about, striking her head on the metal hand railing of the gurney. *Id.* at 6; *see also*, Stickles Dep., ECF No. 82-6 at p. 25-26.

In this regard, it is undisputed that at some point between the start of Tosin's struggle with Stickles and Knutowicz, and Tosin being placed on the gurney, Tosin sustained

---

on us. We went inside for lunch for about 20 mins. Then came back outside. A uniformed police officer was at the front door and told us not to come out the front so we went out the back. When we walked around to the front of the building, I saw 2 female officers talking with the Black female trying to calm her down. The Black female was still screaming, yelling, and going nuts. It was getting worse. The officers then tried to grab the B/F's arms, but she flailed her arms and resisted. She screamed "Jesus Christ" numerous times then the fight went to the ground. I began to back away. I did see the ambulance crew on scene." ECF No. 82-5 at pp. 2-3.

[5] For purposes of this Decision and Order the Court accepts that it was Knutowicz who punched Tosin. However, both Stickles and Viglino indicate that it was Stickles who punched Tosin. *See, e.g.*, Viglino Affidavit ECF No. 82-10 at p. 2 ("The African American girl had the younger longer Blonde hair[ed officer] by her hair. . . . The younger officer was punching the African American girl in the head trying to get her to let go of her hair."); *see also*, Stickle's Use of Force Report (ECF No. 82-15 at p. 2) (Indicating that only Stickles punched Tosin).

a laceration to her forehead that required three stitches. ECF No. 85-1 at ¶ 137.  The parties dispute, however, how that injury occurred.  Ogunbekun contends that Tosin sustained the laceration initially from hitting the concrete porch floor, though he does not specifically dispute that she also later struck her head against the gurney, while Knutowicz and Stickles each deny having seen any such injury prior to Tosin striking her own head against the gurney railing. *See, e.g., Knutowicz Dep*., ECF No. 82-12 at p.  However, in addition to the fact that Ogunbekun's version is entitled to be accepted as true for purposes of this Decision and Order, the report of an emergency medical technician ("EMT") indicates that Tosin was bleeding before she was placed on the gurney, and that after being placed on the gurney she hit her own head against it, which resulted in additional bleeding. ECF NO. 85-14 at p. 3.  Accordingly, the Court accepts as true that Tosin's head injury was related to both making contact with the concrete porch and striking the ambulance gurney.

Apart from Tosin's head injury, Ogunbekun maintains that officers were unnecessarily rough when moving Tosin from the ground to the ambulance gurney, and, indeed, that such transfer was "the most traumatic thing that [he] witnessed" that day. ECF No. 82-2 at p. 54; *see also*, ECF No. 85-1 at ¶ ¶ 119, 121-122 ("There were at least five police officers and at least two ambulance crews on the scene by that time. . . . As I observed the officers moving Tosin to the gurney, it appeared to me that they were intentionally being rough with her.  They slammed her onto the gurney, which was absolutely unnecessary.").

However, Ogunbekun admits that he is not sure which of the many officers who were present at the time actually placed Tosin onto the gurney:

Q. Then what happened?

A. More officers arrived on the scene.

Q. And what if anything did they do?

A. It was – when the officers arrived on the scene they moved her from the ground and put her on the gurney.

***

Q. Okay.  They you said.  Who is "they"?

A. The officers and Tosin – where Tosin was at this time

Q. You said they moved her to a gurney.  Who moved her to the gurney?

A. The officers I believe.

Q. Female officers or the male officers?

A. The EMT were already there.

Q. Okay.

A. *Now, I don't recall exactly who did what precisely, at that point who moved her on to the gurney.*  All I remember is this: The police officers assisted – the male officer and the female assisted in putting her on the gurney[.]

***

Q. I know it's difficult, but I need to know about the gurney incident.

A. Yeah.

Q. So you have male police officers putting her on the gurney?

A. Yes, because I believe – yes, I believe the officers assisted the EMT.  By this time there was a rowdy scene.

Q. Rowdy scene?

A. Rowdy scene, yes. There were like about four or five police officers. They arrived in three different cars – no. Stickles was the first person to arrive then the other female officer then I believe that another two arrived in a separate car – male – then the most senior officer arrived. So you had like, you know, four police – four or five police officers, two ambulance crews already on the scene at that time. It was very rowdy. So there was a lot going on. I cannot tell you that I took in everything or what perspective or what order, but what I recall is this: That I recall the officers assisted in putting her on the gurney and I recall that when they were doing that it was like intentional, you know, like you have given us so much trouble this is what you get. They slammed her on the gurney.

*** 

Q. Were the EMTs in the area?

A. The EMTs were there.

Q. It was the EMTs' gurney, correct?

A. Yes, it was the EMTs', correct.

Q. Were the EMTs trying to get her on the gurney?

A. Were they trying to—

Q. Put her on the gurney.

A. I believe that they assisted.

ECF No. 82-2 at pp. 52-56 (emphasis added); *see also*, Plaintiff's Counterstatement of Facts, ECF No. 85 at ¶ 69 (Indicating that unspecified "officers" were "intentionally rough" when placing Tosin on the gurney); *see also*, SAC at ¶ 18 ("Additional police officers arrived on the scene – *they* lifted [Tosin] (now handcuffed) from the ground and slammed her on the stretcher provided by the Emergency Medical Technicians[.]") (emphasis added).

Knutowicz and Stickles also expressly deny that they were involved in physically placing Tosin on the gurney.  Knutowicz testified that she was not involved in lifting and placing Tosin onto the ambulance gurney, ECF No. 82-12 at p. 11.  Stickles' report indicated that she, as well as officers "Tumbiolo and Flora" had "attempted" to lift Tosin onto the gurney, ECF No. 82-1 at p. 6, but her deposition testimony clarifies that she did not actually lift Tosin onto the gurney:

> Q. [You] could not get her up because she was 'dead weight,' as you've described it?
>
> A. Yeah, we – I mean, they got there, and we were trying to let her stand up so that she could then, you know, walk to the gurney or try to escort her to the gurney.  And so, you know, at that point like I said, the male officers, they came in and they had to physically almost pick her up and try to pick – I was there.  I was close by, but I didn't really – I wasn't overly involved in that, lifting up, that process.  I mean, I remember being there, but I don't remember hoisting her up.
>
> Q. Okay.  But you did make an observation of the two male officers physically picking her up and taking her to—
>
> A. Having to pick her up because she wouldn't stand.  She wouldn't put any weight on her – on her feet, so they had no option but to lift her up, to get her up onto the gurney[.]
>
> ***
>
> Q. Did you observe her actually being physically put into the gurney?
>
> A. I did.  I was – I was within arm's – I was – I was there.  I just wasn't doing the – the hoisting.

ECF No. 82-6 at pp. 25-26.

The record indicates that Tosin was arrested pursuant to New York Mental Hygiene Law § 9.41, and pursuant to New York Penal Law § § 240.26[1] (Harassment in the

Second Degree) and 205.30 (Resisting Arrest).[6]

## PROCEDURAL HISTORY

On May 28, 2015, Ogunbekun filed a *pro se* complaint on behalf of Tosin, which the Court dismissed *sua sponte* since Ogunbekun is not an attorney. Tosin later refiled the same complaint in her own name. ECF No. 4. Thereafter, the parties stipulated to the filing of the SAC, listing Ogunbekun as the "Limited Conservator for the Estate of Olu-watosin Ogunbekun, Incapacitated Person as Plaintiff." ECF No. 34. Count One of the SAC purported to state claims for false arrest and excessive force in violation of the Fourth Amendment under Section 1983 and 42 U.S.C. § 1988. Count Two of the SAC purported to state a claim based on the "policies and practices" of the Town of Brighton and Brighton Police Department, which allegedly caused the alleged Fourth Amendment violations, under 42 U.S.C. § § 1983 & 1988. The SAC indicated that defendants Knutowicz and Stickles were being sued in their individual and official capacities, SAC at ¶ 7, and that the Town of Brighton and Brighton Police Department were being sued under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

The SAC alleges that Stickles and Knutowicz had no basis to make a mental hy-giene arrest, since Tosin was not a threat to herself or anyone else. SAC at ¶ 31. The SAC further contends that Stickles and Knutowicz used excessive force during the arrest, since they banged Tosin's forehead on concrete, punched her several times, and "slammed" her onto an ambulance stretcher. SAC at ¶ ¶ 33-35. Finally, the SAC alleges that Stickles and Knutowicz later maliciously prosecuted Tosin by charging her with

---

[6] See, Stickles Arrest Report, ECF No. 82-1 at p. 1 (arrest was pursuant to PL 240.26-1 PL 205.30).; *see also, id.* at p. 5 ("called for an ambulance for an MHA"); Stickles Subject Resistance Report, ECF No. 82-15 at p. 1 (arrest was pursuant to "MHA 9.41 PL 240.26-1 PL 205.30).

assault and resisting arrest. SAC at ¶ ¶ 22-26.

However, Plaintiff subsequently withdrew her *Monell* claims against the Town of Brighton and Brighton Police Department and disclaimed any intent to pursue a claim for malicious prosecution. *See*, ECF No. 85-17 at p. 19 ("Plaintiff withdraws the claims against the Town and the Brighton Police Department.  Plaintiff has not raised a claim of malicious prosecution under state law.").  Consequently, the claims against the Town of Brighton and Brighton Police Department, and any claims relating to malicious prosecution, are dismissed.  The remaining claims in this action are pursuant to Section 1983, for false arrest and excessive force in violation of the Fourth Amendment, against Stickles and Knutowicz in their individual capacities.

On June 27, 2022, following the completion of discovery, Defendants filed the subject summary judgment motion.  On August 31, 2022, Plaintiff filed opposition papers, ECF No. 85.    On October 13, 2022, Defendants filed a reply, ECF No. 89.

## LEGAL STANDARDS

### Rule 56

Defendants have moved for summary judgment, pursuant to Fed. R. Civ. P. 56, which may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the

movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

Additionally, the movant must demonstrate, and not merely assert, that he is entitled to judgment under the relevant principles of law. *See, Baker v. Anschutz Expl. Corp.*, 68 F. Supp. 3d 368, 373 (W.D.N.Y. 2014) ("While the absence of any genuine dispute of material fact is a precondition for summary judgment, the crux of a summary judgment analysis is whether the movant has established entitlement to judgment as a matter of law.") (quoting 11–56 MOORE'S FEDERAL PRACTICE—CIVIL § 56.20 (Matthew Bender 2014)), adhered to on reconsideration, No. 11-CV-6119 CJS, 2016 WL 981858 (W.D.N.Y. Mar. 15, 2016); *see also*, *Darley v. U.S.*, No. 22-CV-00714 (PMH), 2025 WL 1159518, at *3 (S.D.N.Y. Apr. 21, 2025) ("Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law.  Simply put, the movant must separately establish that the law favors the judgment sought.") (citations omitted).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[7]  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at

---

[7] "The substantive law governing the case will identify those facts which are material and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." *Heard v. City of New York*, 319 F.Supp.3d 687, 692 (S.D.N.Y. 2018).

249.  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

"[R]eliance upon conclusory statements or mere allegations is not sufficient to de-feat a summary judgment motion[, but, rather,] [t]he nonmoving party must go beyond the pleadings, and by [his or] her own affidavits, or by the depositions, answers to interroga-tories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (citations and internal quotation marks omitted).

Moreover, the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citations omitted).

## DISCUSSION

### Section 1983 Claims for False Arrest and Excessive Force

"To state a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law." *McCloud v. Jackson*, 4 F. App'x 7, 9 (2d Cir. 2001) (citation omitted).

[Section] 1983 is not itself a source of substantive rights, but merely pro-vides a method for vindicating federal rights elsewhere conferred. ... [For

example, i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right.

*Graham v. Connor*, 490 U.S. 386, 393–94, 109 S. Ct. 1865, 1870–71, 104 L. Ed. 2d 443 (1989) (citations omitted).

To establish liability under Section 1983, a plaintiff must show that each defendant was personally involved in the alleged constitutional violation. *See, Ganek v. Leibowitz*, 874 F.3d 73, 92 (2d Cir. 2017) ("As the Supreme Court has instructed, because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff bringing [either type of claim] must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") (citation and internal quotation marks omitted).

For example, a police officer is not personally involved in an allege constitutional violation merely because he was present at the scene of an arrest.[8]  However, in actions involving multiple police-officer defendants, a defendant officer may be personally involved either because he directly violated the plaintiff's rights or because he failed to intervene to prevent another officer from violating such rights.[9]

It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from

---

[8] *See, Snead v. City of New York*, 463 F. Supp. 3d 386, 398 (S.D.N.Y. 2020) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.  An officer's mere presence at the scene of a stop or arrest generally does not constitute sufficient personal involvement for § 1983 liability.") (citation and internal quotation marks omitted, collecting cases), *reconsideration denied sub nom*. *Snead v. LoBianco*, No. 16-CV-09528 (AJN), 2021 WL 861060 (S.D.N.Y. Mar. 8, 2021).

[9] *See, e.g., Harris v. City of New York*, No. 15-CV-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017) ("To be held liable under § 1983 for false arrest or failure to intervene, an officer must be "personally involved" in an unlawful arrest.  An officer can be personally involved in one of two ways: He can directly participate in the arrest, or he can fail to intervene to stop an unlawful arrest when the evidence establishes that he would have been able to do so.") (citations omitted).

infringement by other law enforcement officers in their presence.  An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.  Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted).

### *Fourth Amendment False Arrest*

Plaintiff's first Section 1983 claim is for false arrest in violation of the Fourth Amendment.  In this regard, the SAC contends that it was unreasonable for Stickles and Knutowicz to seize Tosin under the Mental Hygiene Law, since at the time of the arrest Tosin was merely "letting-off steam" and "not threaten[ing] anybody." SAC at ¶ 13.  The SAC further implies that Tosin was not a realistic threat in any event, since she was "a 5 ft 3 in female weighing approximately 160 lbs and armed with nothing but a basketball." SAC at ¶ ¶ 21, 37.  Rather, the SAC characterizes the arrest as having been unreasonably made, based merely on Tosin's "non-compliance" with Stickles' orders to return home. *Id*. at ¶ 14 ("She decided to [arrest Tosin under the Mental Hygiene Law], apparently for non-compliance."); *see also, id*. at ¶ 31 (accord).

Defendants maintain that they are entitled to summary judgment on the false-arrest claim, because there was probable cause for the arrest, in which case there was no Fourth Amendment violation, or, alternatively, because there was arguable probable cause, which entitles them to qualified immunity.  Defendants further argue that since Plaintiff accepted an adjournment in contemplation of dismissal regarding her criminal

charges, she is collaterally estopped from now claiming that there was no probable cause for the arrest.

Plaintiff opposes the motion, purportedly since there are triable issues of fact as to whether Stickles and Knutowicz had probable cause to conduct a mental hygiene arrest. More specifically, Plaintiff primarily maintains that "there is a genuine issue as to whether the Defendants had probable cause to arrest Tosin pursuant to Mental Hygiene Law § 9.41," since Tosin was not doing anything "seriously harmful" by standing in the rain or talking to the contractors at 84 Wintergreen Way.  As part of this argument, Ogunbekun maintains that there is a triable issue of fact as to whether Tosin threatened to kill anyone, since he did not personally hear her make such threats.  In particular, Obunbekun argues that Stickles is the only person who claims to have heard Tosin say she wanted to kill her father, ECF No. 85-17 at pp. 14, 15, and, therefore, "there is a genuine issue of material fact as to whether Tosin actually uttered those words[.]" ECF No. 85-17 at pp. 15-16; *see also, id.* ("Ogunbekun did not hear those words, and was not aware that Tosin had been accuse of uttering them until informed by a doctor at the hospital.").

Alternatively, Ogenbekun maintains that, "even if Tosin did utter [threats to kill], the words in and of themselves cannot be said to have evinced a danger that Tosin was conducting herself in a manner likely to result in serious harm to herself or others." ECF No. 85-17.  Indeed, Ogunbeken faults Stickles for not informing him of the threats, stating that if she had done so, he "would have pointed out that children often express hyperbolic 'threats' such as were attributed to Tosin that day, without truly intending to harm their parents." ECF No. 85-17 at p. 9; *see also, id.* at p. 20 ("Tosin's alleged 'threat' against her father amounts to nothing more than childish expostulations that were not entitled to

credence.").

Ogunbekun further contends that there is a triable issue of fact regarding probable cause, since the defendant officers were acting under the influence of "implicit racial bias." As evidence of this, Ogunbekun maintains that Tosin was 5 feet 3 inches tall and 160 pounds, while Stickles estimated, in her police report, that Tosin was 5 feet 6 inches tall and 200 pounds. Plaintiff insists that this alleged discrepancy is significant, since it illustrates the unwitting racism of the arresting officers: "The white witnesses' implicit bias against Blacks is evident in their descriptions of Tosin, including but not limited to Defendant Stickles' (Fischer's) inflating Tosin's height by 3 inches, and her weight by 40 pounds[.]" ECF No. 85-17 at p. 16.

Lastly, Ogunbekun argues that any arrest and any accompanying use of force against Tosin was necessarily improper and unnecessary, since it was Stickles' fault that Tosin left the Ogunbekun residence after being returned there. In this regard, Ogunbekun testified at deposition that when Tosin began walking "leisurely" out of the house (after being returned there by Stickles), he felt powerless to stop her from leaving again, since Stickles was "in charge":

> A. Personally, what I would have done on that date, I would have made sure that Tosin did not go out of the house once she was already inside. She would let off steam inside of the house.
>
> Q. How would you have kept her from going outside?
>
> A. I would have locked the door- period – *but the officer was there. She was in charge*.
>
> Q. So then what happened?
>
> A. *The officer allowed her* to go back into the street.

ECF No. 82-2 at p. 39 (emphasis added).  Ogunbekun reiterates this belief -- that Stickles is to blame for the arrest and use of force—stating, in his opposition affidavit: "Based upon my years of living with Tosin, I believed at the time and continue to believe that *if Defendants Stickles (Fischer) had simply directed Tosin to stay inside our home, and allowed me to lock the door*, that no harm would have come to my daughter or anyone else." ECF No. 85-2 at ¶ 143 (emphasis added).

Defendants, in their reply papers, maintain that Plaintiff has not raised any triable issue of fact.  Particularly regarding the false arrest claim and the existence of probable cause, Defendants point out that not only had Tosin made threats toward Obunbekun, Stickles, and Knutowicz, but she also was a danger to herself, since she

> was apparently not being supervised in any way by her father.  . . .  [H]e was apparently supervising Tosin only intermittently.  Dr. Ogunbekun failed to observe many of Tosin's actions, including the fact that she was dancing in the middle of Wintergreen Way while it was raining and she was kicking a basketball in the road.  . . . He was completely unaware that Officer Stickles had arrived on the scene and had been talking to Tosin for some time until Stickles call him on the phone.  She not only called Tosin's father, but she brought Tosin back to the house so that she would be safe.  However, Dr. Ogunbekun did nothing to keep his daughter at the house.

ECF No. 86 at pp. 4-5; *see also, id*. at p. 7 ("When Officer Stickles arrived on-scene she found an individual who had mental disabilities, in the rain, in the middle of the public road, talking to people who were not there, and who was unsupervised.").  As further evidence of the danger Tosin posed to herself, Defendants note that at the time of arrest, Tosin was attempting to enter a stranger's home at 84 Wintergreen Way, due to her delusional belief that her nonexistent ex-husband live there. *Id*. at 5.

Having considered the parties' arguments, the Court finds that Defendants are

entitled to summary judgment on the false arrest claim.  The law applicable to Fourth

Amendment claims for false arrest under Section 1983 is well settled:

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. This protection "adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016). Probable cause to arrest "exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted). To handcuff and detain a person for mental-health reasons, an officer must have "probable cause to believe that the person presented a risk of harm to himself or others." *Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001) (citation omitted).
>
> Even if there was no probable cause, "an arresting officer is entitled to qualified immunity so long as arguable probable cause was present when the arrest was made." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (internal quotation marks and citation omitted). Arguable probable cause exists if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotation marks and citation omitted). In other words, qualified immunity will protect an arresting officer unless "no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Id.* (internal quotation marks and citation omitted).

*Mercedes v. City of New York*, No. 22-1776-CV, 2023 WL 8594055, at *1–2 (2d Cir. Dec.

12, 2023).

The existence of probable cause is an objective determination, and therefore, the

arresting officer's subjective beliefs or intentions are irrelevant to a court's inquiry:

> [T]he [defendant officers'] subjective beliefs [that plaintiff was innocent] are irrelevant, since the existence of probable cause is an objective determination. *See, e.g., Roberts v. Azize*, 767 F. App'x 196, 198 (2d Cir. 2019)

("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). This inquiry is an objective one: "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id*. at 153, 125 S.Ct. 588 (emphasis added).); *see also, Nzegwu v. Friedman*, 605 F. App'x 27, 30 (2d Cir. 2015) ("[T]he state of mind of the arresting officer—that is, his subjective reason for believing there to be probable cause to arrest—is irrelevant to the probable cause determination, even if the officer's subjective reason is foolish or based on improper factors. For this reason, Nzegwu's allegations that Defendants arrested him, at least in part, because of his national origin and race, are irrelevant to the legal inquiry: they go to the officers' subjective reason for arresting him, not to the facts before Defendants at the time of his arrest.") (citation omitted).

*Newsome v. Miller*, No. 18-CV-6756 CJS, 2024 WL 3415363, at *11 (W.D.N.Y. July 15, 2024).

In the instant case, Tosin was arrested pursuant to, *inter alia*, New York's Mental Hygiene Law § 9.41,[10] which states, in pertinent part, that,

[a]ny peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody <u>any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others</u>. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 of this article, or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40 of this article, or pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.

---

[10] *See*, ECF No. 82-15 at p. 2 (referencing that arrest was pursuant to "MHA 9.41").

N.Y. Mental Hyg. Law § 9.41(a) (McKinney 2025) (emphasis added).

> New York law defines "likelihood to result in serious harm" as: "(i) a sub-
> stantial risk of physical harm to the person as manifested by threats of or
> attempts at suicide or serious bodily harm or other conduct demonstrating
> that the person is dangerous to himself or herself, or (ii) a substantial risk of
> physical harm to other persons as manifested by homicidal or other violent
> behavior by which others are placed in reasonable fear of serious physical
> harm." [Mental Hygiene Law] § 22.09(a)(3).

*Accardi v. Cnty. of Suffolk*, No. 24-903, 2025 WL 88281, at *1 (2d Cir. Jan. 14, 2025).

In this context, "[t]he Fourth Amendment requires only a probability or substantial

chance of dangerous behavior, not an actual showing of such behavior." *Lurch v. Chaput*,

No. 16 CIV. 2517 (AT), 2022 WL 889259, at *7 (S.D.N.Y. Mar. 25, 2022) (citation and

internal quotation marks omitted), *aff'd*, No. 22-798-PR, 2023 WL 2469943 (2d Cir. Mar.

13, 2023).

A threat of homicide or other violence, in conjunction with other circumstances,

may be sufficient to satisfy this standard:

> On September 11, 2018, when Mrs. Accardi arrived home, she observed
> [her husband,] Plaintiff, to be disoriented and acting irrationally. . . . Plaintiff
> yelled at her for taking their son to the doctor without him. He threatened to
> stab her, and even though he was not holding a knife, this scared her. . . .
> When Mrs. Accardi woke up, Plaintiff confronted her and was acting irra-
> tionally. Mrs. Accardi did not want to stay in the house with Plaintiff as she
> did not feel safe. Plaintiff told Mrs. Accardi that if she left, he would kill
> himself. . . . [T]here is an abundance of undisputed evidence in the record
> which would allow a reasonable officer to believe Plaintiff was a danger to
> himself or to Mrs. Accardi. Specifically, Mrs. Accardi recounted in her sworn
> statement that she observed Plaintiff in an agitated and erratic state for over
> two days, which involved him screaming and "not really making any sense."
> When Mrs. Accardi left the home, Plaintiff called her and told her he knew
> where she was. Plaintiff also threatened to stab Mrs. Accardi and threat-
> ened to kill himself. . . . Given the significant record of Plaintiff's erratic
> behavior over the course of the events on September 11-12, 2018, Plaintiff's
> argument that a jury could find that the phrase "... maybe I should just kill

myself" as "nothing more than rhetoric between spouses," is unpersuasive. Rather, Mrs. Accardi's sworn statement to the SCPD indicates that Plaintiff had threatened suicide and threatened to harm his wife.  The eyewitnesses who encountered Plaintiff on those days observed that he was acting errat-ically as if he was under the influence.  These specific observations and information support a finding that there was "a probability or substantial chance of dangerous behavior" by Plaintiff, specifically, that he might hurt himself or his wife. The Court therefore finds that Defendant Manfredonia had probable cause to transport Plaintiff to CPEP.

*Accardi v. Cnty. of Suffolk*, No. 21-CV-05051 (HG), 2024 WL 1345233, at *2 (E.D.N.Y. Mar. 29, 2024) (footnotes and citations to record omitted), *aff'd*, No. 24-903, 2025 WL 88281 (2d Cir. Jan. 14, 2025).

However, this standard may also be met even in the absence of threats or explicitly violent behavior. *See, e.g., Aouatif v. City of New York*, No. 07CV1302RRMJO, 2019 WL 2410450, at *10 (E.D.N.Y. May 31, 2019) ("Aouatif argues that she did not pose a risk of harm to herself or others, emphasizing that she displayed no violent behavior. The Fourth Amendment, however, requires only a 'probability or substantial chance of dangerous behavior, not an actual showing of such behavior' to support a seizure for involuntary transport.  It was reasonable for Kotbi to conclude that Aouatif exhibited a "probability or substantial chance" of dangerous behavior, in light of her mental conditions, even absent explicitly violent behavior.") (citations omitted), *aff'd*, 811 F. App'x 711 (2d Cir. 2020).

For example, probable cause was found for a mental hygiene arrest where an adult woman with Down's Syndrome was found hallucinating and unattended by family mem-bers:

> Viewing the facts that were available to the officers, even in the light most favorable to Anthony, the officers had probable cause to seize Anthony. Given that Anthony has Down's Syndrome and had [falsely] reported to an emergency operator less than twenty minutes before the police arrived that

she was being beaten by a "husband" who had a knife and a gun, and given that there was no one present who could provide the officers with assurance that Anthony would not suffer another episode of terror or who could provide for Anthony's safety in their absence, it was reasonable to believe that Anthony might, if left alone, conduct herself in a manner likely to result in serious harm to herself. In reaching this conclusion, the officers were entitled to consider the likelihood that Anthony would experience another hallucination and might cause serious injury to herself during that episode even though she appeared calm to them. Accordingly, there was probable cause to seize Anthony.

*Anthony v. City of New York*, No. 00 CIV. 4688 (DLC), 2001 WL 741743, at *5 (S.D.N.Y. July 2, 2001) (footnote and citation omitted), *aff'd*, 339 F.3d 129 (2d Cir. 2003).

Here, the facts known to the defendant officers at the time of the arrest were that Tosin was a twenty-five year old woman with mental disabilities which had reportedly been worsening in recent months, to the point where she would not do anything her father told her to do, and who, because she was angry with her father, had left home and was walking and dancing in a public roadway in the rain, talking to herself and holding and bouncing a basketball. Tosin was angry, hallucinating, speaking with persons who were not there, claiming to be a princess and a supervillain, and bothering contractors. After Stickles returned Tosin to her home, Tosin left again, without any interference from her father, who, despite claiming that Tosin was hallucinating and required "constant supervision," left her unsupervised outside for stretches long enough for her to suffer serious harm.[11] Tosin had further attempted to enter a stranger's home, after claiming that her

---

[11] *Compare, e.g.*, Ogunbekun Deposition, ECF No. 82-2 at pp. 34-35 ("I was watching her. I was watching her from the house. So I saw what was going on *to a large extent. I didn't see everything that was happening. I wasn't too worried* for several reasons. One, in the past Tosin had been allowed to go for short walks in the community by herself, you now, minimal oversight. I would just drive by and just make sure she was safe. She would not see me or anything. We wanted her to live as independently as possible and she was prior to 2012 able to do that *to some degree. So when she wandered out of the house I was not worried—especially as she was not going on to the main road*. She was going to the end of the cul de

non-existent ex-husband lived there. Except for agreeing to return to her home the first time, Tosin disregarded every command given to her by Stickles. Additionally, Tosin stated that she wanted to kill her father, and that she wanted Stickles and Knutowicz to die.

These facts objectively establish probable cause for an arrest under the Fourth Amendment and New York Mental Hygiene Law § 9.41, pursuant to the legal standards set forth earlier.

Plaintiff's contrary arguments lack merit. For example, Plaintiff's contention, that there is a triable issue of fact about whether Tosin threatened to kill Ogunbekun, since Stickles is the only person who heard the threat, is simply an incorrect statement of the law. Stickles has indicated, in sworn statements, that Tosin made the threat, and Ogunbekun, who admittedly was not present when the threat was made, has not come forward with any evidentiary proof to the contrary. Consequently, there is no triable issue of fact on that point. And, in any event, it is similarly undisputed that Tosin stated she wished both Stickles and Knutowicz were dead.

Nor is there any merit to Plaintiff's assertion that Stickles and Knutowicz lacked probable cause, since they were influenced by "implicit racial bias." To begin with, there is not a shred of actual evidence of any improper racial motive, but rather, only Ogunbekun's subjective beliefs, which are insufficient to create a triable issue of fact. Additionally, even assuming that Ogunbekun had evidence of such a bias by the officers, it

---

sac.") (emphasis added), *with Id*. at 47 ("By this time she had started hallucinating again because, like I said, her mental state was unstable.") *and id*. at 23 (Testifying that as of May 2012, Tosin "could no longer stay at home by herself. She was no longer competent to stay at home by herself. . . . [I]t was not safe for her to do that – not that she posed a risk to herself, but she just was not able to distinguish risk from – she was no longer mentally competent to do that.").

would still not raise a triable issue of fact, since an arresting officer's subjective beliefs or motives are irrelevant to a court's objective inquiry into the existence of probable cause.

Finally, Plaintiff's assertion, that the arrest was unreasonable because Stickles was to blame for "allowing" Tosin to leave her home again after being returned there, is utterly unsupported, and, frankly, ridiculous. In particular, Ogunbekun's contentions, that he was somehow powerless to attempt to stop his disabled daughter from leaving the house because Stickles was "in charge," and that Stickles somehow did not "allow" him to lock his own door to keep Tosin inside, are contrary not only to common sense, but also to the record. Specifically, Ogunbekun's sworn deposition testimony admits that he purposely let Tosin go back outside because Tosin was angry with him, and he wanted Stickles to handle the problem. *See*, Ogunbekun Dep., ECF NO. 82-2 at p. 41 ("I left them briefly because she was mad at me, mind you. . . . Tosin was mad at me. So I stepped back[,] [t]o allow the officer to do her job and defuse the situation and bring her back home.").[12] Ogunbekun's related contention, that the need for an arrest would have been obviated if only *Stickles* had ordered Tosin to remain inside,[13] is similarly preposterous, as shown by the record,[14] and legally meritless.

In sum, the Court finds that Stickles and Knutowicz are entitled to summary

---

[12] Ogunbekun's decision in this regard is also quite puzzling, considering his insistence that Tosin became especially agitated around police officers. *See*, ECF No. 85-1 at ¶ ¶ 31-34 ("[H]er mental acuity had diminished; her mental status was very severely compromised; she became more easily agitated by strangers, especially law enforcement.").

[13] Again, *see*, Ogunbekun Aff., ECF No. 85-2 at ¶ 143 ("[I]f Defendants Stickles (Fischer) *had simply directed Tosin to stay inside our home*, and allowed me to lock the door, that no harm would have come to my daughter or any-one else."). (emphasis added); see also,

[14] Ogunbekun told Stickles that Tosin would not do anything he told her to do, and Tosin similarly disregarded Stickles' orders.

judgment on the false arrest claim, since there was probable cause for the arrest under Mental Hygiene Law § 9.41 and the Fourth Amendment.  Alternatively, the Court finds that Defendants had at least arguable probable cause, and are therefore entitled to qualified immunity, since a reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed.

<em>Fourth Amendment Excessive Force</em>

Plaintiff's second claim is that Stickles and Knutowicz violated the Fourth Amendment by using excessive force during the arrest.  According to the SAC, the excessive force consisted of Stickles and Knutowicz "banging" Tosin's head on concrete, Knutowicz landing "several blows" to Tosin's head, and "additional police officers" "slamming" Tosin onto an ambulance stretcher. SAC at ¶ ¶ 16-18, 33-35.

Defendants maintain that they are entitled to summary judgment either because the force used was objectively not excessive under the circumstances, or because they are entitled to qualified immunity.  More specifically, movants contend that Tosin's injury was *de minimis*, and, alternatively, that the degree of force used was necessary, and not excessive,  in relation to Tosin's actions in fighting the officers:

> The alleged injuries of a small head laceration do "not rise to the level of objective excess that reasonable police officers would consider to be unlawful conduct in an arrest situation." *Wilder v. Vill. of Amityville*, 288 F. Supp.2d 341, 344 (E.D.N.Y. 2003). This is especially true where it was the result of Tosin's own conduct in resisting arrest by fighting, kicking, and grabbing Officer Stickle's ponytail and yanking Officer Stickle's head about so violently that they both went to the ground.  Even if Tosin could show an injury sufficient to maintain her claim, summary judgment should still be granted because Officer Stickles and Knutowicz acted reasonably in the situation in question.

Defendant's Memo of Law, ECF No. 82-19 at pp. 10-11.

30

Plaintiff agrees that Tosin actively resisted the efforts by Stickles and Knutowicz to arrest her, but nevertheless contends that the degree of force used was objectively unreasonable, primarily since "all of Tosin's alleged physical actions were in response to Defendants' unjustified use of force against her." ECF No. 85-17 at p. 19 (emphasis in original).  That is, Plaintiff contends that there was no probable cause for the arrest, and that therefore any use of force to effect the arrest was unjustified.

Alternatively, Plaintiff maintains that the force used was excessive, since Tosin was intellectually comparable to a child, making her resistance understandable:

> Tosin did not begin yelling until after the officers grabbed her, and similarly that she did not grab Officer Stickles' (Fischer's) ponytail until after the officers grabbed her. Bearing in mind that Tosin is a mentally disabled individual who functioned at a Kindergarten to second grade level and had chronic difficulty in appropriately communicating her feelings and understanding how her behavior and attitude affected those around her, her conduct can best be likened to that of a frightened and confused six- or seven-year old child.

> Defendants' assertion that Tosin dragged them to the concrete floor of the porch does not accurately reflect their own reports, which suggest, although do not make clear that the three women fell to the floor after Defendant Knutowicz applied a "knee strike," and knocked Tosin's feet out from under her. It seems likely that Tosin's hand was twisted in Defendant Stickles' ((Fischer's) hair at the time, which resulted in at least two of the women falling to the porch. A panicked child-like person, who was terrified and incapable of understanding why she was being attacked by police officers, found herself underneath two female officers with an EMT sitting on her legs. Is it any wonder that she struggled?

ECF No. 85-17 at pp. 20-21.

Defendants respond, in their reply, that Plaintiff seems to be arguing that the officers should not have used any force, which is incorrect, since the officers were legally entitled to make the arrest. *See*, ECF No. 86 at p. 10 ("[Plaintiff] seems to be arguing that

the officers were required to take no action against Tosin whatsoever. Where, as here, the officers had probable cause to make a mental hygiene arrest, they were entitled to effectuate the arrest."). Further, Defendants reiterate that the force used was proportional in countering the force that Tosin was exerting to avoid arrest. *Id*. ("Tosin reacted violently, grabbing Officer Stickles by her ponytail and violently twisting and pulling her hair. At that point, the officers used very limited physical interventions to get Tosin to release her hold of Officer Stickles' hair. That included a hand strike and a knee strike. That force was in direct proportion to the physicality of Tosin grabbing Officer Stickles by the ponytail and yanking her head around. Tosin was told numerous times to stop resisting, but she did not."). Defendants thus maintain that there was no excessive force violation, and alternatively, that they are entitled to qualified immunity. Lastly, Defendants assert that there is no evidence that Stickles and Knutowicz were responsible for allegedly slamming Tosin onto the ambulance gurney.

Having considered the parties' arguments, the Court finds that Stickles and Knutowicz are entitled to summary judgment. In this regard, the relevant legal principles are clear:

> "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy*, 623 F.3d at 96. Application of this reasonableness test "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Graham [ ] stands for the proposition that a government officer may not intrude on a person's Fourth Amendment rights by employing a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019). The *Graham* factors and the reasonableness of a use of force are "judged from the perspective of a

> reasonable officer on the scene," and we must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

*Singh v. City of New York*, No. 23-24-CV, 2024 WL 319117, at *4 (2d Cir. Jan. 29, 2024); see alo, *see also, id*. at *7 ("[A] police officer cannot use significant force against an individual where that individual does not pose an immediate threat to the safety of others or is not actively resisting arrest or attempting to evade arrest by flight.") (citation omitted).

"In light of the fact-specific nature of an excessive force claim, granting summary judgment against a plaintiff on such a claim is not appropriate unless no reasonable fact-finder could conclude that the officers' conduct was objectively unreasonable." *Mercedes v. City of New York*, No. 22-1776-CV, 2023 WL 8594055, at *3 (2d Cir. Dec. 12, 2023) (quoting *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (internal quotation marks omitted). In this regard, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at 396–97, 109 S. Ct. at 1872.

Moreover, the doctrine of qualified immunity may shield defendants from suits for damages for excessive force:

> The doctrine of qualified immunity "shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (alteration omitted). When a defendant moves for summary judgment based on qualified immunity, courts consider "whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established

at the time of [the] defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). If the constitutional right invoked by the plaintiff was not "clearly established" at the time of the purported violation, qualified immunity precludes civil liability and the defendant is entitled to summary judgment. *See Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ("[R]easonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.").

A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Taravella*, 599 F.3d at 133. This requires that "'controlling authority' or 'a robust consensus of cases of persuasive authority'" have recognized the right at issue. *Liberian Cmty. Assoc. of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). Although we do not require a case "directly on point" to hold that a defendant's conduct violated a clearly established right, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017).

"When a plaintiff alleges excessive force ... the federal right at issue is the Fourth Amendment right against unreasonable seizures." Tolan v. Cotton, 572 U.S. 650, 656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014). In analyzing whether this right has been violated, courts must be careful "not to define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, 131 S.Ct. 2074, because "[t]he dispositive question" for the purpose of qualified immunity "is 'whether the violative nature of particular conduct is clearly established,'" *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (quoting *al-Kidd*, 563 U.S. at 742, 131 S.Ct. 2074); *see also District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 590, 199 L.Ed.2d 453 (2018) ("The 'clearly established' standard ... requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."). Qualified immunity would be "no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).

> Accordingly, our inquiry focuses on the specific "factual situation the of-
> ficer[s] confront[ed]," and the defendants will be "entitled to qualified immun-
> ity unless existing precedent 'squarely governs' the specific facts at issue."
> *Kisela v. Hughes*, [584] U.S. [100], 138 S. Ct. 1148, 1152-53, 200 L.Ed.2d
> 449 (2018).

*McKinney v. City of Middletown*, 49 F.4th 730, 738–39 (2d Cir. 2022).

In the instant case, Plaintiff does not clearly articulate, using the applicable legal factors, why the specific force used was excessive, except to assert primarily that "all of Tosin's alleged physical actions were in response to Defendants' unjustified use of force against her." ECF No. 85-17 at p. 19.  Alternatively, Plaintiff seemingly argues only that Tosin's actions were understandable in light of her mental condition, and that the officers therefore should not have continued with the arrest once she began to resist. ECF No. 85-17 at p. 21 ("A panicked child-like person, who was terrified and incapable of under-standing why she was being attacked by police officers, found herself underneath two female police officers with an EMT sitting on her legs.  Is it any wonder that she strug-gled?").[15]  That is, Plaintiff maintains that the alleged constitutional violation consisted of the officers making a bad prudential judgment about whether to forcibly arrest Tosin at all.  Indeed, Plaintiff insists that the officers "mishandled the situation" by attempting to arrest Tosin, when they instead should have simply waited for her to calm down. *See*, Ogunbekun Aff., ECF No. 85-1 at ¶ ¶ 83-85 ("Defendant Stickles (Fischer) told me that she was initiating a mental hygiene arrest.  I told Defendant Stickles that *I believed that was the wrong call*.  Based upon my years of experience with Tosin, *I believed* that it was necessary to back off a bit, and patiently wait for Tosin to relax and clam down and move

---

[15] This quote from Plaintiff misstates the order of events, since Tosin "found herself beneath two police officers" precisely because she violently resisted the officers' attempt to arrest her.

off the porch.") (emphasis added).

However, Plaintiff's arguments lack merit.    Preliminarily, insofar as Plaintiff's ex-cessive force claim is based on the alleged "slamming" of Tosin's body onto the ambu-lance gurney, which Ogunbekun insists was the most serious and upsetting example of excessive force, the Court finds that even assuming *arguendo* that such action was of constitutional magnitude, Stickles and Knutowicz are entitled to summary judgment since they were not personally involved.    There is no genuine material issue of fact as to whether Stickles or Knutowicz was one of the officers who did the alleged slamming, since both have indicated in sworn statements that they did not lift and transfer Tosin onto the gurney, and Ogunbekun has admitted that he is not sure which officers did.    Specifically, Ogunbekun's vague statement, that 'the female assisted in putting [Tosin] on the gurney," after he previously admitted, in response to very clear questioning from Defendants' coun-sel attempting to pin him down on this point, that he did not know who did what, is insuf-ficient to raise a triable issue of fact as to whether either Stickles or Knutowicz slammed Tosin onto the gurney.    In this regard, the Court notes that even the operative pleading, the SAC, is consistent with the version of events testified to by Stickles and Knutowicz, since it indicates that Tosin was put onto the ambulance gurney by "additional officers" who arrived at or about the time that Tosin was handcuffed. *See*, SAC at ¶ 18 ("*Additional police officers* arrived on the scene – *they* lifted [Tosin] (now handcuffed) from the ground and slammed her on the stretcher provided by the Emergency Medical Technicians[.]") (emphasis added).[16]

---

[16] Ogunbekun made the same factual admission in his first Amended Complaint, ECF No. 4 at p. 4, ¶ 18 ("Additional police officers arrived on the scene – they lifted [Tosin] (now handcuffed) from the

Nor can either Stickles or Knutowicz be said to have failed to protect Tosin from the other officers, since there is no suggestion that either had any warning that such "slamming" was going to occur, or any opportunity to intervene.

Consequently, any excessive force claim against Stickles and Knutowicz must be based solely on the force that the two officers used to subdue and handcuff Tosin, after she began violently resisting the arrest.

As to that use of force, Plaintiff's arguments also lack merit.  To begin with, insofar as Plaintiff claims that any force used was excessive since the Officers had no probable cause to arrest Tosin, the argument fails, since the Court has already determined that there was probable cause for the arrest.  Plaintiff's alternative argument, that the officers should not have forcibly arrested Tosin since she is mentally ill and afraid of police officers, also fails, since, again, there was probable cause for the arrest, and "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Otherwise, Plaintiff has not articulated, let alone shown, how the force used by the officers was excessive under the circumstances, particularly considering that it is undisputed that the force used was applied primarily, if not exclusively, to force Tosin to release Stickles' hair.[17]  There is no contention or indication that Stickles or Knutowicz applied force that was gratuitous or exceeded what was reasonably necessary to effect the arrest

---

ground and slammed her on the stretcher provided by the Emergency Medical Technicians[.]"), and in his proposed Third Amended Complaint, ECF No. 36-2 at ¶ 19.

[17] There is no indication that the officers continued punching Tosin after she released Stickles' hair. Indeed, Ogunbekun is not capable of making such an assertion, since he stated, in his sworn deposition testimony, that he never actually saw whether or not Tosin had grabbed Stickles' hair, and that he did not see what Tosin was doing with her hands during Tosin's scuffle with the officers.

and overcome Tosin's violent efforts to avoid being handcuffed.

In that regard, applying the "*Graham*" factors set forth earlier,[18] the Court finds that the "crime" for which Tosin was being arrested was not "severe," which weighs in Plaintiff's favor, but that the other two factors weigh heavily in Defendants' favor, since, according to the undisputed facts, Tosin actively and violently resisted arrest throughout the entire incident, which posed an immediate threat to the officers' safety.  In particular, after Stickles explained to Tosin that she needed to go to the ambulance and grabbed Tosin's arm, Tosin violently fought the officers by grabbing Stickle's hair, punching Stickles, kicking, and then attempting to hit and bite Stickles and Knutowicz, all while yelling, "You're not going to put cuffs on me!" ECF No. 82-9 at p. 2.  Tosin had control of Stickles' head, and refused approximately ten orders to let go of Stickles' hair.[19]  Tosin refused to release Stickle's hair until after the officers applied a knee strike and several punches.[20]  Even after releasing Stickles' hair, Tosin continued fighting and attempting to kick the officers, until a paramedic sat on her legs.[21]  While Tosin and the officers were struggling on the ground, Tosin's head made incidental contact with the concrete porch surface, resulting

---

[18] "Application of this reasonableness test "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resist-ing arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[19] *See*, ECF No. 82-10 at p. 2 ("The African American girl had the younger longer [haired] blonde [officer] by her hair.  The officers were yelling let go of my hair and stop resisting.  I heard them yelling the command 10 or more times.").

[20] *See*, ECF No. 82-10 at p. 2 ("The younger officer was punching the African American girl in the head trying to get her to let go of her hair.").

[21] *See*, ECF 82-9 at p. 3 ("Paramedics did go and sit on the black female's legs.  But she continued to fight.  She also tried kicking the officers, the tools, and the plants by the sidewalk.").

in an abrasion to her forehead.[22]

On these facts, the Court finds that no reasonable factfinder would conclude that the force used exceeded what was reasonably necessary under the circumstances to overcome Tosin's resistance. *See, Kalfus v. New York & Presbyterian Hosp*., 476 F. App'x 877, 880–81 (2d Cir. 2012) ("Kalfus resisted arrest by refusing to stand up or to permit himself to be handcuffed, and that the patrolmen used only reasonable force to overcome Kalfus's resistance. . . .  No reasonable factfinder could conclude that such actions were excessive in the circumstances.") (citations omitted); *see also*, *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) ("[In conducting the *Graham* balancing test,] we are careful to evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Moreover, we are required to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.") (citations and internal quotation marks omitted); *Matusak v. Daminski*, 755 F. Supp. 3d 325, 337 (W.D.N.Y. 2024) ("[A]mple authority supports the conclusion that law enforcement officers may use significant force to subdue a resisting arrestee who poses an ongoing threat.") (collecting cases).  Indeed, despite the

---

[22] Contrary to the bald assertion in the SAC that the officers "banged" Tosin's head on the pavement, there is no evidentiary proof in the record that the officers intentionally caused Tosin's head to strike the concrete surface on which the arrest happened to take place. The fact that Tosin sustained this injury does not imply that the force used against her was excessive. *See, e.g., Kalfus v. New York & Presbyterian Hosp*., 476 F. App'x at 881 ("Nor does Kalfus's shoulder injury demonstrate excessive force. Kalfus points to nothing in the record to refute his own surgeon's testimony that the rotator cuff tear was an extension of a pre-existing tear, about which Kalfus failed to inform the arresting officers. Because the patrolmen had no reason to know that Kalfus's existing shoulder injury might be aggravated if his arms were pulled or he were handcuffed, the amount of force that they used to respond to Kalfus's resistance to arrest could not be deemed objectively "unreasonable" by any reasonable jury."). Tosin also struck her head on the ambulance gurney handrail while continuing to flail about, but that injury is not attributable to defendants.

use of force by Stickles and Knutowicz, the officers were still not able to gain control of Tosin and apply handcuffs, until after a non-party EMT sat on Tosin's legs.  Consequently, Stickles and Knutowicz are entitled to summary judgment on the Fourth Amendment  excessive force claim.

Alternatively, the Court finds that Stickles and Knutowicz are entitled to qualified immunity as to that claim, since Plaintiff has not identified either a controlling authority or a robust consensus of cases of persuasive authority clearly establishing the constitutional violation he alleges,[23] which forecloses the conclusion that the defendant officers violated clearly established constitutional rights of which a reasonable person would have known. Rather, the Court finds that reasonable officers could disagree as to whether the force Stickles and Knutowicz employed was lawful, considering Tosin's continued violent resistance during the arrest. *See, McKinney v. City of Middletown*, 49 F.4th 730, 734 (2d Cir. 2022) ("The undisputed facts of the case show that McKinney threatened the defendant officers and actively resisted their efforts to subdue and secure him. Under those circumstances, reasonable officers could disagree as to whether the force the defendant

_____

[23] Plaintiff has not provided authority clearly establishing that it violates the Fourth Amendment for police officers to use a knee strike and punches to the head, against someone who is actively resisting arrest by attempting to punch and bite the officers while holding one of the officers by the hair. *See, e.g., Kisela v. Hughes*, 584 U.S. at 104, 138 S. Ct. at 1152 ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate. . . . Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the *specific facts at issue*.") (emphasis added, citations and internal quotation marks omitted).

officers applied in this case was lawful.")[24] Consequently, Defendants are also entitled to summary judgment on Plaintiff's excessive force claim.

## CONCLUSION

Defendants' motion for summary judgment (ECF No. 82) is granted, and this action is dismissed. The Clerk of the Court is directed to enter judgment for Defendants and close this case.

SO ORDERED.

DATED:    May 15, 2025
          Rochester, New York

                                    _Charles J. Siragusa_
                                    CHARLES J. SIRAGUSA
                                    United States District Judge

---

[24] *McKinney* involved three jail officers who used baton strikes, taser, and K-9 officer, to subdue a jail inmate who refused to allow officers to enter his cell or to handcuff him, including allowing the K-9 to continue biting the inmate, even after he stopped actively resisting, until he allowed himself to be handcuffed. *See, McKinney v. City of Middletown*, 49 F.4th at 739 ("The undisputed facts of this case establish that McKinney threatened, attacked, and resisted the defendant officers as they tried to subdue him so that he could be transferred to a different cell. The undisputed facts further establish that the officers' incremental and combined uses of a baton, a canine, and a taser were undertaken in response to McKinney's resistance and that once McKinney "finally gave up fighting" and was "handcuffed and secured," the officers withdrew their force.").